EVANS *et al. v.* CITY OF JACKSON.

(In Banc. Dec. 9, 1946. Suggestion of Error Overruled Jan. 13, 1947.)

[28 So. (2d) 249. No. 36224.]

Howie, Howie & McGowan, of Jackson, for apellants.

Harold Cox, of Jackson, for appellee.

Argued orally by **M. M. McGowan**, for appellant, and by **W. H. Cox**, for appellee.

**Roberds, J.**, delivered the opinion of the Court.

J. M. Evans filed a bill in this cause asking the court to hold invalid and set aside a tax sale to the State of Mississippi made April 6, 1942, and a patent from the State to the City of Jackson, Mississippi, dated July 9, 1945, to approximately ten acres of land located in the southwest portion of said City and known as the Dunbar Cemetery property, and to confirm his title to said property. Five persons joined him as complainants in the bill, four of these having a brother, and a fifth a son, buried in said grounds. The City made its answer a cross bill and prayed for confirmation in it of title to said property. The chancellor dismissed the bill and sustained the cross bill.

. The primary question involved on the appeal is whether the land, at the time of its assessment and sale for taxes, was subject to taxation, and that, in turn, depends on whether it was then being used exclusively for burial purposes.

Section 9697, Code 1942, exempts from taxation "All cemeteries used exclusively for burial purposes." The chancellor found as a fact that the land was not being used exclusively for burial purposes when assessed and sold for taxes and that it was subject to assessment and sale therefor. The question now is whether he had substantial evidence before him to support such finding of fact. This requires us to summarize the evidence.

. The course and manner of transfer and sale of the property have a bearing upon that question. We will detail that.

On August 3, 1929, C. E. Maley conveyed to R. B. Thomas, Jr., and H. G. Seitz, twenty acres of land, which included the ten acres under consideration. Thomas and Seitz, on the same day, executed to Maley a deed of trust on the land to secure the entire purchase price, payable in three annual installments, evidenced by three promissory notes, the last installment being due August 3, 1932, one J. O. S. Sanders being the trustee.

On August 29, 1929, a charter was granted by the State to Thomas and Seitz and one H. S. Gerson to acquire, own, use and maintain property for cemetery purposes and to operate the business of an undertaker.

On September 5, 1929, Thomas and Seitz conveyed to Gerson a one-third interest in said land, Gerson assuming one-third of the debt thereon.

On the same day these three parties conveyed the land to the Dunbar Cemetery Company, Inc.

On September 11, 1929, the property in controversy was platted into lots and blocks as the Dunbar Cemetery property, and on September 21, 1929, that plat was duly recorded in Hinds County, in which the property was located.

On September 20, 1929, Dunbar Cemetery Company, Inc., conveyed to the City of Jackson approximately half of the original twenty acres it acquired, the ten acres sold to the City being adjacent to the property retained and here in controversy. The City acquired its property as a potter's field for the burial of members of the negro race, and it has since been, and is now being, used exclusively as such.

On September 20, 1929, C. E. Maley, the mortgagee, released from his trust deed the property so purchased by the City of Jackson.

On March 27, 1935, the Maley trust deed was foreclosed and the property was purchased by C. E. Maley, Jr.

April 23, 1935, C. E. Maley, Jr., conveyed the property to G. C. Thornton, trustee, but the instrument does not

state for whom or for what purpose Thornton was made trustee.

April 30, 1935, Thornton, trustee, conveyed to Mary M. Peaster.

On June 29, 1938, in litigation between one Saul Cooper and Thornton, trustee, the Chancery Court of Hinds County decreed that Cooper was the owner of a one-third interest in the land.

On May 5, 1945, Mary M. Peaster executed a quitclaim deed to her interest in the property to Walter A. Scott, a part of the consideration being the assumption by Scott of ". . . all ad valorem taxes, State, County and City, for the fiscal year 1945 and all previous years taxes that may be delinquent and all assessments of every kind that may be due."

On June 18, 1945, Saul Cooper executed a quitclaim deed to Walter A. Scott, a part of the consideration being the assumption by the grantee of taxes as in the Peaster deed.

On July 31, 1945, Walter A. Scott executed a special warranty deed to J. M. Evans.

The property was assessed for state and county taxes for the years 1940 and 1941. On April 6, 1942, it sold for nonpayment of state and county taxes. It had also been assessed for municipal taxes and in April 1941 sold for nonpayment of such taxes to Virgil Howie, but it seems to be conceded that the sale to the State, if valid, superseded the municipal sale—at least, there is no contest of that question involved in this case.

On July 9, 1945, before Scott conveyed to Evans, the State issued a patent to the City of Jackson.

The testimony of one Banks, an undertaker, also shows that prior to the foreclosure of the Maley trust deed on March 27, 1935, four members of the negro race had been buried on this land; that another was so buried July 11, 1935, and another, April 13, 1938. Another undertaker testified his firm had buried there "one or two or three or four." He did not fix the time, but his evidence indi-

cates it was before 1935. There are over one thousand lots on the plat. Banks testified that the depression put a stop to the sale of lots in 1930. However, no witness testified to the location of any particular person's grave. They appear to be scattered, and, indeed, there is some uncertainty whether some of these were buried in Dunbar or in the municipal potter's field. There are no tombstones, monuments or permanent markers. All graves are about or below the level of the ground. They are grown up with grass, weeds, and briars. It appears that the organizers of this project came to Mississippi from Texas and they departed for parts unknown after they realized they were going to lose the property under the foreclosure sale. It is further shown by the evidence that the entire property was rented out for farming purposes for the years 1940 to and including 1945 at a yearly rental of $40.00. The rent was paid either to Mr. Maley or his mother. During those years the land was planted and cultivated to cotton, corn, potatoes, and sorghum,—"straight farming," as one tenant expressed it, except that the tenant ploughed around "those two or three places" where he could tell there were graves.

From this it is evident, we think, the chancellor had ample proof to support his finding that at the time of the assessment and sale of this property for taxes, it was not then being used exclusively for burial purposes. Indeed, the evidence would support the conclusion that the part thereof not actually occupied as graves had been abandoned as a cemetery by nonuser, with no evident intent on the part of the orginal founders, or their subsequent grantees, to use or maintain it as a burial ground in the future.

Under these circumstances, the patent to the City vestin it all right, title and interest of appellant Evans and his predecessors in title to the said property, and the chancellor was correct in so decreeing.

However, the question arises as to the effect of this upon the actual graves, if they can be located, and the

rights incidental thereto. There is oral evidence in the record of the purchase of two lots. No deed, or other writing, to any lot is shown to have been executed; therefore, we cannot say what interest, or right, the grantees have in these lots. But whatever right, title or interest did vest in said lots by virtue of this arrangement it was not taxable. The resting place of the dead is holy ground, and the sentiment of all civilized peoples revolts at the thought of the hand of the tax-gatherer upon the sepulcher. Their sleep is not to be disturbed, nor the right of their kin to visit and care for their last resting place. See Morgan v. Collins School House, 160 Miss. 321, 133 So. 675.

Only one of the five kinsmen joining in the bill testified, and she said her only interest in the property was to have it properly maintained as a burial ground. Fortunately, in this case that is to be done. Both the resolution of the City authorizing the application for the patent and the patent itself recite that the purpose of the municipality in acquiring this property was to use, preserve, and maintain it as a burial ground for members of the negro race. The Mayor and one of the City Commissioners testified it was greatly needed for that purpose and it would be so used, and the learned chancellor set this out in his decree confirming the title of the City. On the other hand, there is no showing in this record that Mr. Evans intends doing that. He did not testify.

The chancellor decreed that the City, by virtue of its purchase of the described property, also acquired full and unrestricted right of ingress and egress thereto along and across the openings, paths, and approaches abutting the property needed for access thereto to utilize it for burial purposes. These alleys, ways and approaches are shown upon the plat. They are laid out with reference to access to the various lots and blocks described on the plat. The property was assessed according to this plat. Alone, these avenues, ways and approaches would have no appreciable value. They are necessary and es-

sential to the proper use of the property. The plat is in a manner a muniment of title to the property shown thereon. We think the chancellor was correct. See Loggans v. Love, 183 Miss. 97, 183 So. 389.

Affirmed.

**Sydney Smith, C. J.,** did not participate in this decision.