# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-IA-00646-SCT

*GEORGE P. HEWES, III AND BROWN &*
*WILLIAMSON TOBACCO CORPORATION*

*v.*

*CYNTHIA LANGSTON*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/1999 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL W. ULMER |
| | WILLIAM F. GOODMAN, JR. |
| | LEAH D. McDOWELL, JR. |
| | MARGARET STEWART OERTLING |
| | W. WAYNE DRINKWATER |
| | DAVID W. CLARK |
| | LAKE TINDALL |
| ATTORNEYS FOR APPELLEE: | TERI DUNAWAY GLEASON |
| | JEFFERY P. REYNOLDS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 09/11/2003 |
| MOTION FOR REHEARING FILED: | 07/02/2003; Denied 07/10/2003 |
| MANDATE ISSUED: | 07/17/2003 |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing was denied in this case by order issued July 10, 2003. The

original opinions are withdrawn, and these opinions are substituted therefor.

¶2.     This is the second time this interlocutory appeal has been before this Court with the same issue for review.  Attorney George P. Hewes, III and the Brown & Williamson Tobacco Corporation (B&W) seek review of orders by the Hinds County Circuit Court compelling them to provide attorney Cynthia Langston with a number of documents which they claim to be privileged.

¶3.     For purposes of an in camera inspection by the trial court, the documents were divided into 68 numbered "Items,"[1] with some of the Items containing multiple documents.  After the in camera inspection, the trial judge concluded that 38 of the Items were not discoverable, but ordered the remaining 30 Items to be turned over to Langston, finding "that the documents reviewed are relevant to the issues raised in Plaintiff's complaint and are therefore discoverable."   From that order, Hewes and B&W sought and were granted permission to bring this interlocutory appeal.  *See* M.R.A.P. 5.

¶4.     Hewes and B&W subsequently withdrew their objection to Item 38, a letter and draft affidavit from Alan Perry (Hewes's original counsel in this action), to Richard Roberts, counsel for Mike Miller, Langston's ex-husband.  Further, Item 23 is a chronology of events with numerous attachments.  The trial judge concluded that the chronology of events, itself, was not discoverable but that the attachments to the chronology were discoverable.  Hewes and B&W withdrew their objection to most of the attachments to Item 23, but maintained

---

[1]Each group of documents has an Item  number, sequentially numbered from 1 to 68.  Also, each page of each document has a Bates number, beginning with GPH 000001, and ending with GPH 000514.  Of the 68 Items, only 29 are before this Court on appeal.  For the sake of clarity, we refer to each document at issue simply by its Item number.  However, where an Item contains multiple documents, which need to be distinguished from each other, we refer to it by its Item and Bates number(s), for example: Item 23/Pages 184-85.

their objection to one of the letters that was part of the attachments, Item 23/Page 183.  Thus on appeal, of the original 30 Items, there remain 29 at issue.

¶5.     When this interlocutory appeal was first before us, we determined that the trial court's findings of fact and conclusions of law were insufficient for a meaningful review, and we remanded the case to the trial court to enter "findings of fact and conclusions of law regarding each of the twenty-nine items as to which discovery is now contested."  After further findings by the trial court, this interlocutory appeal is now before us for a second time with the same issue for review:

> **DID THE CIRCUIT COURT ERR IN ORDERING HEWES TO PRODUCE TWENTY-NINE ITEMS OF PRIVILEGED MATERIALS?**

¶6.     To more effectively discuss this issue, we have divided this issue into the following subsections:

> **A.     Application of the Attorney-Client Privilege, the Work Product Doctrine, and the Crime-Fraud Exception**
>
> **B.     The Trial Court's  in Camera Review of the Materials at Issue**
>
> **C.     Findings of Fact and Conclusions of Law Regarding Each of the Twenty-nine Items as to which Discovery is now Contested.**

¶7.     Concluding that the trial court erred in determining that all of the 29 Items were discoverable, we reverse and remand.

## FACTS

¶8.     In 1996, Cynthia Langston served as counsel for the plaintiffs in *Butler v. Phillip Morris, Inc.*, a wrongful death action filed in the Jones County Circuit Court against tobacco manufacturers.  While that litigation was ongoing, Langston was in the process of divorcing

3

her then husband, Mike Miller, who was a manager for BellSouth Telecommunications. Langston accused Miller of using his position at BellSouth to improperly access her telephone records. Langston further alleged that sometime before the divorce was finalized, Miller contacted George P. Hewes, III, an attorney with the law firm of Brunini, Grantham, Grower & Hewes, PLLC (the Brunini firm), which represented the tobacco companies, claiming to have proof of improper ex parte contact between Langston and Circuit Judge Billy Joe Landrum, the presiding judge in the tobacco case. Approximately one year later, the defendants in the tobacco case successfully pursued Judge Landrum's disqualification from that case.

¶9.    Subsequently, Langston came into possession of a letter, written on the letterhead of the Phelps Dunbar, LLP law firm, that accused Hewes and two attorneys with Phelps Dunbar of communicating with Miller about Langston's private telephone conversations regarding the tobacco litigation. The letter was signed "haunted friend"; however, the attorney whose printed name appeared on the official stationery, by affidavit, denied any knowledge of or involvement in the production of the letter.

¶10.    In June 1998, Langston filed the present suit in the Hinds County Circuit Court against BellSouth, B&W (and its parent corporations) and the Brunini firm, as well as Hewes and Miller individually, alleging negligence, conspiracy to invade privacy and negligent infliction of emotional distress. During discovery, Langston sought to compel Hewes to produce numerous documents which Hewes claimed were privileged. After reviewing the documents in camera, the trial judge concluded that thirty-eight of the Items were not

4

discoverable, but thirty were, and ordered that they be produced. Hewes filed an interlocutory appeal, and the trial court stayed the order pending our review.

¶11. Because the trial judge's initial order requiring Hewes and B&W to produce the documents was general in nature and did not make findings of fact and conclusions of law as to why each of the Items were discoverable, this Court was unable to conduct a proper review. For that reason, we remanded this case to the trial court to complete that task.

¶12. On remand, the trial judge entered a six-page order which responded to our request. It contained a lengthy explanation of the facts and history of the case, and, generally, of the applicable law. However, we were not provided any specific explanation of the trial judge's basis for concluding why certain documents were discoverable and others were not. Having now reviewed the documents and trial judge's response, we reverse and remand.

## STANDARD OF REVIEW

¶13. The application of privilege is properly a mixed question of law and fact, with the circuit court's factual findings reviewed for clear error and its interpretation of the law reviewed de novo. *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994).

## DISCUSSION

¶14. Prior to addressing the merits of this appeal, we first consider Langston's contention that the Governor should have appointed two special justices to participate in deciding this appeal. Justices Waller and Diaz elected not to participate in this case. In her motion for rehearing, Langston argues that under Article 6, Section 165 of the Mississippi Constitution the Governor should have appointed two special justices to hear the case, "to assure that the Court maintained a full complement of justices." One of these vacancies, that of Justice

5

Diaz, was the result of Langston's choice of Richard F. Scruggs for representation in this case. Attached to her motion is a copy of a petition to the Governor urging these appointments for rehearing.

¶15. Certainly, under proper circumstances, the Governor may make appointments of special justices. Langston is incorrect, however, in her belief that any time fewer than nine justices participate in a case the Governor must, under Section 165 of the Constitution, appoint special justices to fill out a "full complement of justices."

¶16. Even with two justices electing not to participate, there remain seven justices, more than a quorum of the Court, to consider this case. Section 165 of the Constitution should not be read in isolation. Section 145B provides that five justices constitute a quorum of the Court. Most recently, the Court addressed this question in its unpublished but recorded orders entered in *Rein v. Benchmark Construction Co.,* No. 2001-CA-01885-SCT (Miss. Jan. 3, 2003) and *Doe v. Stegall*, No. 2001-CA-1674-SCT (Miss. Jan. 3, 2003.) In those cases, Presiding Justice McRae in an order recusing himself solicited the appointment by the Governor of a special justice to sit in his stead. Due to the unusual nature of the request for the special appointments, the Court, en banc, reconsidered the matter and issued its orders holding that such appointments are not needed.

¶17. In *PERS v. Hawkins*, 781 So. 2d 899 (Miss. 2001), all justices recused in a case brought by former Chief Justice Hawkins, and the parties agreed on five special justices, who were appointed by the Supreme Court, to determine the case. Addressing the constitutional and jurisdictional question of this panel's authority, it was said:

6

> This panel of Special Justices constitutes a quorum of the Court and has full jurisdiction and authority pursuant to Article 6, Section 145B and Section 165 of the Mississippi Constitution to decide all issues raised by the filing of the Petition of Interlocutory Appeal by Public Employment Retirement System of Mississippi (PERS). . . .

*Hawkins,* 781 So. 2d at 900.

¶18.   A similar question was raised in *Carter v. State*, No. 97-CT-01468-SCT (Miss. Jan. 28, 2001), where the appellant sought recusal of Justice Easley and the referral of the case to the Governor for appointment of a special justice under Section 165.  There, Justice Easley had elected not to participate before the motion for recusal was filed, and the recusal motion was dismissed as moot.  Then the Court, by unpublished but recorded order, found that "there is a quorum of the Court sufficient to decide the case," and denied the request for referral to the Governor.

¶19.   In *Slush v. Patterson*, 201 Miss. 113, 29 So. 2d 311 (1947), the Court had before it on suggestion of error a case in which the trial court was reversed.  The case was decided by a three to two vote during a time when the Court had six members.  The appellee then raised the point that during the period when the case was considered and decided one member of the Court was absent due to illness.  Holding that sitting without the absent justice was not error, the Court addressed the argument that the Governor should have been asked to appoint a special justice:

> The commonly recognized definition of a quorum is that it is such a number of a body as is competent to transact business in the absence of the other members. 35 Words and Phrases, Perm.Ed., p. 672 et seq.
>
> Acting upon this express authority, our Supreme Court during the entire course of the thirty years since the amendment [increasing the Court to six justices] has always proceeded with the business of the Court when as many

7

as four members are present and participating, and in the same manner as if those present comprised the entire membership of the Court, **and because during the thirty years there has never been a time when less than four members were present and participating, we have never within that period made a request upon the Governor to appoint a special judge for the Court. We have considered that the delay and expense incident to special appointments were a material consideration in the incorporation of the quoted language in the amendment, and we have conformed to its purpose.**

In the year immediately next following the adoption of the amendment, the case of Brewer v. Browning, 115 Miss. 358, 76 So. 267, L.R.A.1918F, 1185, Ann.Cas.1918B, 1013, was decided with five Judges participating--one Judge disqualified. The decree of the Chancery Court was reversed by the vote of three Judges, two voting for an affirmance. A case by case search through the eighty volumes of our official reports since that time will disclose that not less than a dozen cases have been disposed of under the same procedure, consistently followed for more than a quarter of a century.

**It is too late now to consider that all those cases were decided without constitutional authority, because reversed by the vote of three instead of four Judges,** and we hereby expressly bring forward and affirm what was said on the subject by Smith, C. J., in response to the suggestion of error in Dean v. State, 173 Miss. 254, at pages 309 and 310, 160 So. 584, 162 So. 155.

*Slush,* 201 Miss. at 132, 29 So. 2d at 311 (emphasis supplied).

¶20. It is quite common for justices of this Court to elect for various reasons not to participate in cases, whether or not parties file motions seeking recusal, and for reasons of conscience or other reasons which may not, by law, disqualify them. It is estimated that there are as many as 500 occasions per year in which a justice will not participate in a case. Langston's interpretation of Section 165 would require special appointments in each of these instances, interfering with the orderly consideration of cases with a negative impact on the cohesiveness of the established Court. To require appointments in every such situation

8

would additionally impose a burden and expense on the state and place demands on the Governor which the Constitution never intended.

¶21. Furthermore, such an interpretation could in closely controverted cases, where a single vote will be decisive, place the ultimate power to adjudicate with the executive branch rather than with the judiciary. A more invidious possibility is that of parties creating opportunities to recuse justices and then seeking appointments of more favorable replacements. This seems to be more frequent in recent years and is an evil to which the Court must be ever vigilant.

¶22. In her motion for rehearing, Langston relies heavily upon and quotes at length from Presiding Justice McRae's dissent, presenting no new arguments that were not previously considered by the Court. Concerning the appointment of special justices, she relies entirely on Presiding Justice McRae's position which the Court has frequently rejected. His position has been thoroughly considered by this Court in his repeated efforts to obtain appointment of special justices where he was required to disqualify himself.

¶23. Presiding Justice McRae recused in the *Rein* and *Doe* cases due to the interest in those cases of his daughter who is a lawyer and her lawyer husband, Shane Langston. He also was required to recuse in other cases due to that relationship. See the discussion of *Stephens v. The Equitable Life Assurance Society*, No. 2002-CA-498-SCT (Miss.); *Owens Corning v. Altria roup, Inc.*, No. 2001-CA-1285-SCT (Miss.); *Lane v. R. J. Reynolds Tobacco Co.*, No. 2001-CA-384-SCT (Miss.) and *The Equitable Life Assurance Society v. Irving*, No. 2002-TS-513-SCT (Miss.), in the Chief Justice's Separate Statements issued with the Court's orders in *Rein* and *Doe*. In each of those cases, Presiding Justice McRae wrote

9

to the Governor suggesting the appointment of a special justice. The Governor has made no such appointments.

¶24. Today we reiterate the long standing application of Section 165. The appointment of a special justice to this Court is appropriate where the Court lacks a quorum and where the parties are unable to agree in the selection of special justices to hear a case. However, so long as the Court has a quorum to conduct business, such an appointment is not authorized by our Constitution. Therefore, we consider the merits of the appeal.

¶25. While in the past we have entertained interlocutory appeals concerning questions of privilege where there were "arguably a question of law or law application, within the meaning of [M.R.A.P. 5],"we have categorically rejected the "wholesale granting of interlocutory appeals of civil discovery disputes." *Haynes v. Anderson*, 597 So.2d 615, 617 (Miss. 1992) (quoting *In re Knapp*, 536 So. 2d 1330, 1333 (Miss. 1988) ("Pre-trial discovery is governed by flexible rules well within the administrative capacity of our trial courts")). In *Haynes* we noted that application of privilege should be considered by the trial court "using a case by case, item by item approach." *Haynes*, 597 So. 2d at 619. Accordingly, in *Haynes* we ultimately remanded the case due to the trial court's failure to explain whether the materials at issue were privileged work product subject to an exception or whether they were not actually considered work product at all. *Id.* at 620.

¶26. Hewes and B&W argue that all 29 Items at issue are protected by the attorney-client privilege or the work product doctrine. Langston responds that the documents are not so protected, and even if they were, they would fit within the crime-fraud exception to the privilege.

10

## A. Application of the Attorney-Client Privilege, the Work Product Doctrine, and the Crime-Fraud Exception

### *Attorney-Client Privilege*

¶27. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct 677, 66 L. Ed. 2d 584 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby to promote broader public interests in the observance of law and administration of justice." *Id.* at 389. "That purpose, of course, requires that clients be free to make full disclosure to their attorneys." *United States v. Zolin*, 491 U.S. 554, 562, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989).

¶28. In its version of the attorney-client privilege, Mississippi follows the uniform rule adopted by a majority of the states. Rule 502(b) of the Mississippi Rules of Evidence explains the privilege[2] as follows:

> **(b) General Rule of Privilege.** A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and **concerning a matter of common interest therein**, (4) between representatives of a client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

---

[2]Even though Rule 502 is actually entitled "Lawyer-Client Privilege", in the present case the parties and the trial judge refer to the privilege by its more common name, attorney-client privilege. Thus we will do so as well.

Miss. R. Evid. 502(b) (emphasis added).  This Court has interpreted the scope of the attorney-client privilege under Mississippi law broadly, stating:

> the privilege relates to and covers **all information** regarding the client received by the attorney in his professional capacity and in the course of his representation of the client. Included are communications made by the client to the attorney and by the attorney to the client.  In that sense it is a two-way street.

*Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984) (emphasis added).  Further: "[t]he privilege does not require the communication to contain purely legal analysis or advice to be privileged." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991) (applying Mississippi law).  "Instead, if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." *Id.* at 875.

¶29.    A significant part of the attorney-client privilege for purposes of this appeal is the "common interest" privilege, as set forth in Miss. R. Evid. 502(b)(3).  According to the comment to the rule: "The privilege extends to statements made in multiple party cases in which different lawyers represent clients who have common interests."  Miss. R. Evid. 502 cmt.

### The Work Product Doctrine

¶30.    The work product doctrine protects an attorney's thoughts, mental impressions, strategies, and analysis from discovery by opposing counsel.  *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393, 91 L. Ed 451 (1947).  As the Supreme Court said:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients.  In performing his various duties, however, it is essential that a lawyer

12

work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways--aptly though roughly termed . . . as the "Work product of the lawyer."

*Hickman*, 329 U.S. at 510-11, 67 S. Ct. at 393. "Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and mental impressions of an attorney." *Id.* at 510. Further, "[t]he work product privilege is very different from the attorney-client privilege." *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). It "does not exist to protect a confidential relationship but to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Id.* at 382. Without this privilege, "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial." *Hickman*, 329 U.S. at 511.

¶31. Rule 26(b)(3) of the Mississippi Rules of Civil Procedure explains the work product doctrine as follows:

> **(3) Trial Preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things **otherwise discoverable** under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such

13

materials when the required showing has been made, the court **shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney** or other representative of a party concerning the litigation.

Miss. R. Civ. P. 26(b)(3) (emphasis added).

¶32. Langston argues that a party seeking discovery of work product materials can do so by showing a "substantial need" for the materials and the inability to obtain substantially equivalent materials without "undue hardship." However, as Hewes points out, this is a misstatement of the law. Even if the party seeking discovery makes a showing of substantial need and undue hardship, pursuant to the rule, "the court **shall** protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney." Miss. R. Civ. P. 26(b)(3) (emphasis added).

### *Crime-Fraud Exception*

¶33. Rule 502(d) of the Mississippi Rules of Evidence creates several exceptions to the attorney-client privilege. One such exception, relevant to the case sub judice, is what has been termed the "crime-fraud" exception, which the rules of evidence explain as follows:

> **(d) Exceptions**. There is no privilege under this rule:
> (1) *Furtherance of Crime or Fraud*. If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud. . . .

Miss. R. Evid. 502(d)(1).

¶34. Although this Court apparently has not spoken as to whether the crime-fraud exception applies to the work product doctrine, the Fifth Circuit has held that it does, as have the Second and Third Circuits. *See **In re Int'l Sys. & Controls Corp. Sec. Litig.***, 693 F.2d 1235, 1242 (5th Cir. 1982); ***In re John Doe Corp.***, 675 F.2d 482, 492 (2d Cir. 1982); ***In re***

14

*Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979). The Fifth Circuit has adopted a two-part test for determining whether the crime-fraud exception applies to materials protected by the work product doctrine: (1) there must be a prima facie showing of a violation sufficiently serious to defeat the work product privilege, and (2) the court must find some valid relationship between the work product under subpoena and the prima facie violation. *In re Int'l Sys.*, 693 F.2d at 1242.

### B.      The Trial Court's in Camera Review of the Materials at Issue

¶35.    Hewes and B&W argue that there was no evidence of a crime or fraud, and the trial judge made no finding of a crime or fraud; therefore, it was improper for the judge to have reviewed the documents, even in camera, absent such a finding. Langston disagrees, claiming there is proof of a conspiracy, and the crime-fraud exception eliminates any privilege otherwise afforded by the documents at issue.

¶36.    Before a trial judge may engage in an in camera review, the party seeking disclosure must show "a factual basis adequate to support a good faith belief by a reasonable person," that in camera review will show the applicability of the exception. *Zolin*, 491 U.S. at 572. The evidentiary burden that the party seeking disclosure must meet before in camera review is appropriate is therefore significantly less than is needed to actually overcome the privilege itself. *Id.* Once a party seeking disclosure of allegedly privileged materials sets forth a prima facie case that the crime-fraud exception applies, the decision of whether to engage in an in camera review is committed to the sound discretion of the trial court. *Id.*

¶37.    Langston's Motion to Compel states that Hewes had meetings with Miller; that Langston's phone records were accessed improperly; that Miller worked for BellSouth at the

15

time the phone records were accessed; that all of these events took place at suspicious times during the course of the **Butler** litigation; and that they evidenced a conspiracy to gain access to her private records and those of the trial judge in **Butler**.

¶38.	Based on these allegations and arguments, and the fact that Hewes apparently had a role in the removal of the trial judge in the tobacco litigation, we conclude that a reasonable person could believe in good faith that an in camera review of the documents in question could show whether the crime-fraud exception was applicable. **Zolin**, 491 U.S. at 572. Therefore, the circuit court did not abuse its discretion in reviewing the documents in camera.

### C.	Findings of Fact and Conclusions of Law Regarding Each of the Twenty-nine Items as to which Discovery is now Contested

¶39.	The circuit court initially inspected the documents in camera and concluded that some of the documents should be produced, but it did not provide any rationale for its decision as to why some documents were privileged and others were not. On remand, the trial court once again has failed to provide this Court with sufficient information for effective review. For that reason, we are precluded from reviewing the decision of the trial court for clear error and will instead conduct a de novo review of the documents at issue to determine whether they are protected or not.

¶40.	Langston argues that the assertions of privilege were defeated primarily because the documents fit within the crime-fraud exception. (The prima facie case for establishing the crime-fraud exception carries a higher burden than the prima facie case for getting an in camera review of disputed documents.) The former requires proof that the crime or fraud

16

actually occurred. The latter just requires sufficient proof of a crime or fraud such that a review of the documents would reveal whether they were protected. *Zolin*, 491 U.S. at 572. Having carefully reviewed all of the documents at issue, individually, we conclude that none of the documents supports Langston's claim that Hewes conspired with Miller to access Langston's telephone records. We further conclude that Langston has failed to meet her burden of proving that a crime or fraud has actually occurred. Thus, the crime-fraud exception is not applicable.

¶41. We turn next to the determination of whether the documents at issue are protected by the attorney-client privilege or the work product doctrine.

### Item 2: A file memo by Hewes concerning his May 1996 encounter with Miller in downtown Jackson.

¶42. Item 2 is a file memorandum prepared by Hewes, dated May 6, 1996, that describes a chance encounter when Hewes "bumped into" Miller in downtown Jackson, and Miller voluntarily indicated he wanted to "get back in touch" with Hewes. Hewes argues that an attorney's memorandum to the office file and other attorneys, noting conversations with third parties, is protected by the work product doctrine. We agree, particularly with regard to the content of this Item. In fact, such memos receive even greater protection because they necessarily reveal the attorney's mental impressions. *Upjohn*, 449 U.S. at 400-02. They may be obtained through discovery only in rare situations, and upon a far stronger showing than for other work product documents. *Id.* Langston has failed to meet that burden here. Thus, Item 2 is not discoverable, and the trial court erred in determining otherwise.

### Item 25: A legal research memo to Hewes

¶43.    Item 25 is a legal research memo, dated February 20, 1998, prepared by a Brunini law firm associate for Hewes.  Hewes correctly argues that research undertaken by an attorney to respond to a client's request falls within the purview of the attorney-client privilege. *See Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999).  As such, the trial court erred in determining that Item 25 was discoverable.

### *Items 47-68 (excepting Items 51 and 54): Itemized billing records and corresponding DayTimer entries*

¶44.    Langston sought production of all itemized bills  reflecting services Hewes rendered to B&W in the course of the ***Butler*** case, over nearly a three-year period, along with his DayTimer entries from which the bills were created.  The trial court ordered all but two of the itemized bills produced.  Hewes points out that the court gave no explanation or reason in making that determination.  In fact, Hewes contends that the two excepted Items, 51 and 54, are identical in type to Items which the court ordered produced.[3]  Further, Hewes claims he has already redacted and produced all references in the billing records to communications with Miller and has testified at length regarding those meetings.

¶45.    Although this Court has not dealt with this specific issue, courts in other jurisdictions have.  In ***Clarke v. American Commerce Nat'l Bank***, 974 F.2d 127 (9th Cir. 1992), the Ninth Circuit discussed the criteria it uses in determining whether billing records are discoverable:

---

[3]Because those two billing records are not before this Court, we can neither confirm nor deny that allegation.  Also, the trial judge has given us no hint as to why two of the monthly billing statements were protected, but the rest were not.

the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege. **However, correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege**.

*Id.* at 129 (citations omitted & emphasis added). *See also **Chaudhry v. Gallerizzo***, 174 F.3d 394, 403 (4th Cir. 1999) (holding that billing records which identified specific statutes being researched were privileged). While a simple invoice ordinarily is not privileged, itemized legal bills necessarily reveal confidential information and thus fall within the privilege. As one court explained:

> billing records describing the services performed for his clients and the time spent on those services, and any other attorney-client correspondence relating to the performance of legal services and the rates therefor . . . may reveal the client's motivation for seeking legal representation, the nature of the services provided or contemplated, strategies to be employed in the event of litigation, and other confidential information exchanged during the course of the representation.

*In re Horn*, 976 F.2d 1314, 1317-18 (9th Cir. 1992).

¶46.    Hewes argues that the billing statements, along with their DayTimer entries at issue, describe the identities of parties to conversations and correspondence, and the dates and subject matter of legal research performed by Hewes for his client over a period of nearly three years. After reviewing of the billing statements and DayTimer entries, we agree. The documents at issue do not merely indicate the client's name, the amount of payment, and the general nature of the work performed. Instead, the documents detail an hour-by-hour rendition of the work performed for a client over a three-year period. These documents detail, by name, the people with whom Hewes talked, and the topics they discussed. These

19

documents describe the subjects that Hewes researched and the papers he reviewed. These descriptions necessarily reveal strategies, confidential communications, and the thought processes behind the representation. Allowing discovery of these documents would, in effect, allow Langston to be the proverbial "fly on the wall" of the Brunini firm.

¶47. It should be further noted that the Mississippi Bar apparently views detailed billing statements as privileged and confidential. Ethics Opinion No. 246, rendered April 8, 1999, prohibits an attorney from producing billing statements to third parties auditors without the informed consent of the client. The Mississippi Bar concluded:

> In summary, it is the opinion of the Committee that an attorney may ethically . . . provide a detailed billing statement to a third party legal auditing service for review only with the informed consent of the insured and that consent may not be requested by the lawyer if a disinterested lawyer would conclude that the client should not agree to such disclosure.

Miss. Bar, Ethics Opinion No. 246 - Independence of Counsel: Third Party Auditor.

¶48. We conclude that the billing statements and DayTimer entries are the type of detailed statements that are protected by the work product doctrine, and the trial court erred in ordering them produced.

> ***Items 23 (attachment, page 183 only): 26, 30, 31, 35, 36, and 37:
> Various correspondence and attachments, including draft affidavits,
> circulated among Butler defense counsel and Alan Perry***

¶49. Hewes points out that all of these documents are letters, draft affidavits, and other correspondence circulated among defense counsel in ***Butler***, or this action, on matters of common interest. Thus, these documents are protected under the "common interest" prong of the attorney-client privilege as well as under the work product doctrine. Hewes further argues that only attorneys involved either in the ***Butler*** case, or this case, have had access

20

to any of these communications. With the exception of the attachment to Item 23/Page 183, all of these documents were generated after Langston asserted her claims of wrongdoing and were in response to actual or anticipated litigation. We agree that they are protected by the work product rule and the "common interest" prong of the attorney-client privilege, and it was error for the trial court to order these documents produced.

## CONCLUSION

¶50. It is not the intention of this Court to make a habit of conducting de novo review of items challenged during discovery. As a general rule, we have declared that we are "not about to become involved in the wholesale granting of interlocutory appeals of civil discovery disputes." *Haynes*, 597 So. 2d at 617 (citing *In re Knapp*, 536 So. 2d at 1333). However, we went further in *Knapp* and carved out a limited exception, saying that "[i]f the matter thought privileged is ordered disclosed and is in fact disclosed, our later reversal would be founded on the Humpty Dumpty syndrome." 536 So. 2d at 1333. The present case is another in which Humpty Dumpty could not be put back together again, had we not granted interlocutory relief.

¶51. The trial court had two opportunities to conduct an item by item review and ruling, but did not. Thus, we undertook that responsibility in this case, not only to avoid another time-consuming remand to the trial court, but also to clarify this Court's position with regard to review of such discovery challenges. In *Haynes,* we said that "the trial court should deal with each matter in the file on an item by item basis." *Haynes,* 597 So. 2d at 620. However, the contents of the file were not before the Court in *Haynes*, and thus the interlocutory appeal was denied. In the present case, we do have the challenged documents before us.

21

After reviewing the documents item by item, we conclude that all of the documents at issue fall within either the attorney-client privilege or the work product doctrine and thus it was error for the trial court to order them produced.

¶52.    We reiterate that when objections to discovery of specific documents are made, the trial court should deal with each on an item-by-item basis, carefully considering each objection, deciding whether to allow discovery, and stating the rule or exception which provides the basis for the decision.

¶53.    For these reasons, the circuit court's orders compelling production of the 29 Items are reversed, Langston's motion to compel production of the 29 Items is denied, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

¶54.    **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH, P.J., AND CARLSON, J., CONCUR.  EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.  McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.  WALLER AND DIAZ, JJ., NOT PARTICIPATING.  WALLER, J., RESPONDS TO PRESIDING JUSTICE McRAE'S DISSENT WITH SEPARATE WRITTEN STATEMENT JOINED BY PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶55.    As my objection to the order executed July 10, 2003, in this case has already stated, this is just another classic example of the "majority caucus" activity at this Court which undermines the administration of justice and casts a shadow upon this Court's reputation and integrity.  The "majority caucus" faced with the opportunity to pass upon the merits and application of Miss. Constitution, Art. 6, § 165 has chosen to ignore our State's highest law in the Mississippi Constitution.  The majority alleges that the *Slush v. Patterson*, 201 Miss.

113, 29 So.2d 311 (1947), "five vote" rule supports its decision. They are sadly mistaken as a closer look at not only *Slush*, but also *Dean v. State*, 173 Miss. 254,162 So. 155 (1935), and *Brewer v. Browning*, 115 Miss. 358, 76 So. 519 (1917), casts serious doubts on the majority's "five vote" rule. The majority even goes so far as to state that Governor is not "constitutionally authorized" to appoint a special justice, unless a quorum does not exist to rule upon a particular case. If our forefathers wanted or intended such an interpretation, then they would have said so. Suffice it to say, this Court does not have authority to restrict the clear constitutional power vested in the Governor by Art. 6, § 165 which places no such restrictions on his appointment power or the litigants' right to agree to a substitute the justice. Additionally, the majority's failure to afford Langston the rights and protections provided by Art. 6, § 165 deprives her of her rights to due process of law and equal protection of the laws. Lastly, on motion for rehearing, the majority refuses to see that the application of the crime/fraud exception is supported by the record and the confidential in camera documents disclosed to the trial court and this Court for review. I dissent to the underhanded tactics and manipulative procedures employed by the majority during this motion for rehearing, the majority's failure to uphold the supreme law of our State, and the majority's erroneous findings with regard to the application of the crime/fraud exception to the confidential in camera documents. The majority's having an emergency "en banc" and voting to preclude the litigants and the Governor from appointing substitute justices and entering an order with opinions to follow is disingenuous.

¶56. As a preliminary matter, I would like to respond to the "formal response" which was sent to the Governor by the "majority caucus" following their premature Order concerning

the Governor's power to appoint a special justice when a Justice is recused or not participating in a proceeding. The "formal response;" or as the "majority caucus" likes to call it the "response letter;" was sent to the Governor without circulation within this Court and without notice given to myself. The "formal response" contained personal statements concerning myself and the views I have expressed concerning the issues presented on this appeal. Specifically, the "majority caucus" attacked my assertions that the Governor does have Constitutional power to appoint special justices in situations such as this, where the recusal or non-participation of a Justice has an effect on the outcome of the proceeding. I find it more than curious that the "majority caucus" has chosen to circumvent the circulation procedures of this Court in an attempt to discredit my views before the publication of this opinion.

¶57. The procedures and manipulative tactics employed by this Court on the motion for rehearing are astonishing and abominable. According to our Internal Operating Procedure and statute, this Court is currently on a writing break with no published opinions or regularly scheduled en banc conference. Despite our own Internal Operating Procedure, the "majority caucus" has decided to circumvent the rules and order an "emergency" en banc on a motion for rehearing which could certainly have been prescribed the same treatment as all other motions for rehearing. As alluded to in my Objection to the July 10, 2003 order, the "minority" of this Court, as labeled by the "majority caucus", was not notified of the "emergency" en banc set for July 10, 2003, at 9:30 a.m. until Wednesday, July 9, 2003, at 3:30 p.m. Before the en banc began, it was discovered that on Wednesday, Chief Justice Pittman, and Justices Smith, Waller, Cobb, and Carlson, the "majority caucus", met

24

separately to discuss this case and made a determination as to the outcome without an en banc or vote ever having been conducted. During en banc, the "majority caucus" acknowledged that the "emergency" en banc was just a "formality." As under the "five vote" rule in *Slush*, the majority had indeed already decided the outcome of the proceedings and had central legal staff (Pool) draft an order which as documented by our internal computer system was completed at 9:31:17(sec.) a.m. on Wednesday, exactly twenty-four hours before en banc was scheduled, for release at 1:30 p.m. on Thursday.

¶58. Justice Waller; a member of the "majority caucus" which met to decide the outcome of the case on Wednesday, is recused from this case. Despite his recusal, Justice Waller and the "majority caucus" attempt to justify his participation by describing the proceedings as an "administrative matter". Despite the majority's assertions, there should be no such thing as an "administrative participation". There is nor should there be no participation of a Justice, if he or she is recused. When a Justice involves himself in the deliberations of a case, whether they be procedural or substantive, he is still affecting the merits of the case. The "appearance of impropriety" still looms for which recusal and non-participation is not only necessary but mandated by our own Code of Judicial Conduct. Miss. Code. Jud. Cond. Canons 1, 2, & 3. The Preamble to the Code of Judicial Conduct even states that "[i]ntrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system." In line with this purpose, this Court has found that "[t]he participation of the recused person in the selection of a replacement may itself raise questions of impropriety." *Nelson v. State,* 626 So.2d 121, 125 (Miss.1993) (citing *Ferry v.*

25

*State*, 245 Ga. 698, 267 S.E.2d 1 (1980)) (such practices violates the Code of Judicial Conduct). In addition, this Court has explained that "the provisions of § 9-1-105(1) should be used in all instances where there is a recusal and the entry of the appointing order requires the participation of a judge who is recused." *Id.* Under these familiar standards, this Court has found error when a recused trial judge appoints a special judge to sit in his place. *Banana v. State*, 638 So.2d 1329, 1331 (Miss. 1994). It is without question that if a judge is forbidden from participating in the appointment of a judge to proceed over matters for which he is recused and/or not participating, then that judge is also forbidden from blocking the appointment of a replacement judge to preside over that which he is recused. These same principles must apply to the Supreme Court. Justice Waller, who is listed as not participating in this proceeding, should not be allowed to block the appointment of a replacement in these proceedings by citing his power to participate in an "administrative matter." If a recused trial judge attempted to "administratively" participate on a case and thereby transfer or block the transfer of the proceedings to another jurisdiction or judge under the guise of an "administrative matter," he would be before this Court in no time on discipline charges. Why, then is it, that we continue to allow the Justices of this Court to do the same?

¶59. The recusal of Justice Waller on this motion for rehearing is also supported by the circumstances of the present proceedings. Langston seeks this Court's invocation of Article 6, Section 165 of the Mississippi Constitution which provides for the Governor to appoint a "special justice" when a justice of this Court has recused himself. Justice Waller is a Brigadier General in the Mississippi National Guard. He was appointed by Governor Ronnie

Musgrove, the very person who under the present circumstances Langston seeks to appoint "special justices" to this Court. What more of a conflict can one imagine, than the participation of Justice Waller in a proceeding in which a litigant seeks a gubernatorial appointment of a "special justice" to the Supreme Court?

¶60. Justice Waller makes $120,000 with per diem as a Justice, and it is assumed somewhere around $80,000 with per diem as a Brigadier General. This makes him the highest paid elected public official in the State. With his dual positions, Justice Waller serves in two branches of government. As a Justice he is part of the Judicial Branch and as a Brigadier General he is part of the Executive Branch, as his power in the militia is subject to orders from the Governor. *See* Miss. Const. art. 5, § 119 (specifically stating "[t]he governor shall be commander and chief of the army and navy of the state and of the militia, except when they shall be called into the service of the United States."); Miss. Const. art. 9, § 217 (specifically providing that "[t]he governor shall be commander-in-chief of the militia, except when it is called into the service of the United States, and shall have power to call forth the militia to execute the laws, repel invasion and to suppress riots and insurrections."); Miss. Const. art. 9, § 216 (specifically stating "[a]ll officers of militia, except non-commissioned officers, shall be appointed by the governor, by and with the consent of the senate . . . . "); Miss. Const. art. 9, § 218 (specifically providing "[t]he governor shall nominate, and, by and with the consent of the Senate, commission one major-general for the state . . . , and also one brigadier-general for each congressional district, who shall be a resident of the district for which he shall be appointed, and each district shall constitute a militia division."); and Miss. Const. art. 6, § 144 (specifically stating "[t]he judicial power

27

of the state shall be vested in a Supreme Court and such other courts as are provided for in this constitution.")  How is it that Justice Waller can participate in a matter not only where he is "recused" on the merits,  but where he also has an obvious conflict of interest as Governor Musgrove, the one who Langston seeks to have appoint "special justices," is also his commander-in-chief?

¶61.    Of course, this is not the first time that Chief Justice Pittman, Justice Waller, and the caucus of five have manipulated the system in what they deemed "administrative matters." In *Dillard v. Musgrove*, 838 So.2d 261 (Miss. 2003), which involved a challenge to the Supplemental Legislative Retirement Plan (SLRP) which bestowed upon Legislators and the Lieutenant Governor  supplemental benefits beyond the retirement benefits offered to all other State employees, a similar tactical manipulation was used by the "majority caucus." When *Dillard* initially came before the Court, Justice Waller listed himself as "not participating," since Governor Musgrove, one of the defendants in the action, appointed Justice Waller as a Brigadier General in the Mississippi National Guard.[4]  As discussed above, with his dual positions, Justice Waller serves in two branches of the government.  As a Justice he is part of the Judicial Branch and as a Brigadier General he is part of the Executive Branch as his power in the militia is subject to orders from the Governor. *See* Miss. Const. Art. 5, § 119; Miss. Const. Art. 9, § 217;  Miss. Const. Art. 9, § 216;   Miss. Const. Art. 9, § 218; and Miss. Const. Art. 6, § 114   Justices Cobb and Diaz also recused themselves from the case since both would benefit from SLRP as former legislators.[5]

---

[4]  *See Dillard v. Musgrove*, 838 So.2d 261, 269-70 (Miss. 2003).

[5]  *See id.* at 261 & 266.

¶62. On appeal, the only issue before the Court was whether the trial court erred in dismissing the action for lack of standing.[6] The trial court did not address the merits of SLRP; therefore, there was no need for this Court to address the merits of the proceedings either.[7] Presiding Justice Smith wrote the majority decision for the Court and originally only secured four votes, those being himself, Chief Justice Pittman, Justice Carlson, and Justice Graves. Justice Easley and I dissented. With only four votes it would have been a plurality vote and not law. Presiding Justice Smith and Chief Justice Pittman were aware that the majority would not be "law;" since under *Slush*, they have constitutionally claimed that five votes are needed for a majority opinion.

¶63. During this time, the Legislature was in its 2003 session. Chief Justice Pittman had many bills before the Legislature that he wanted passed , particularly his personal pay bill for himself and other justices. These bills touched upon issues such as higher salaries for Justices and the implementation of a state drug court. The state drug court was to be Chief Justice Pittman's legacy for which he spoke openly and publicly about in an effort to secure support. The Members of the Legislature whose support were critical to the passage of these bills included Lieutenant Governor Amy Tuck and Speaker of the House Tim Ford, both of whom benefit from SLRP. Even Governor Musgrove himself benefits from SLRP, as he too is a former legislator. Chief Justice Pittman had numerous meetings concerning these bills with Speaker Ford, Lt. Governor Amy Tuck, Governor Musgrove, and other key legislators all of whom were interested in our opinion on their SLRP retirement. It against this

---

[6] *See id.*, at 262-63.

[7] *See id.*, at 262-63.

29

background that these facts, that Chief Justice Pittman went to Justice Waller and requested that he get back into the *Dillard* case and participate.[8] With a five to two vote, the majority was secure in their opinion and pushed for an immediate February, 2003 hand down of the case.

¶64.    The contents of the opinions in *Dillard* are also important. Presiding Justice Smith, in his majority opinion, did not stop at addressing the lack of standing issue before the Court, but went further to address the constitutionality of the SLRP.[9] I wrote a dissenting opinion which found Dillard had standing to bring suit and also found that there were insufficient facts in the record to make a determination as to the constitutionality of the SLRP.[10] With this opinion the *Dillard* majority made law and secured the legislators an extra retirement over other public employees.  I went on to attach an intra-office e-mail whereby Justice Waller explained that he was changing his position from "not participating" to "participating" at the request of Chief Justice Pittman.[11]  Chief Justice Pittman, in his concurring opinion, admonished my attachment of Justice Waller's intra-office e-mail.[12]  Curiously enough, Justice Cobb who had recused herself from the case due to her past legislative position, decided to join in Chief Justice Pittman's concurrence citing her "authority" under "matters

---

[8] *See id.* at  269-70.

[9] *See id.* at  264-66.

[10] *See id.* at 267-70.

[11] *See id.* at 269-70.

[12] *See id.* at 266.

of court administration".[13]  Justice Waller also wrote a concurrence defending his actions.[14]  He attempted to justify his actions, by stating that he was originally "not participating" which is different from a "recusal".[15]  Not so.

¶65.    In *Dillard* this Court was not even called upon to address the constitutionality of SLRP, but the majority did it anyway with no regard to the financial implications of its holding.  The majority's holding in *Dillard* will no doubt cost millions of dollars out of the general retirement fund since all legislators and Lieutenant Governors from 1989 forward will receive  retirement benefits from the Public Employees' Retirement System (PERS).  It is more than suspicious that, at a time when Chief Justice Pittman was lobbying support for legislation, the *Dillard* case was pushed rapidly through the Court for hand down and Justice Waller after a year and a half suddenly decided to "participate" in the merits of the case when it was discovered that there were insufficient votes to make Presiding Justice Smith's majority "law" and constitutional.  What happened to only needing five Justices to decide a case?

¶66.    After the events in *Dillard*, I felt compelled to bring up for discussion the suspicious events I had witnessed.  In response, Justice Waller wrote a letter stating that he was not appointed by the Governor, but by President Bill Clinton and confirmed by the U.S. Senate and  was not an employee of the Governor, and is merely a federal employee.  Well, these assertions are riddled with problems.

---

[13]  *See id.* at 266.

[14]  *See id.* at 266-67.

[15]  *See id.* at 267.

¶67. First of all, if it is true that Justice Waller's appointment was confirmed by the United States Senate, and in order to be considered for such nomination, he had to first secure a recommendation and "appointment" from the Governor. He serves at the will and pleasure of the governor during his term. The Mississippi Constitution provides for the Governor to be commander-in-chief of the militia, commonly referred to as the Mississippi National Guard. *See* Miss. Const. art. 5, § 119 & art. 9, § 217. Under his power over the militia, the Governor is vested with the authority to appointment a Brigadier General to the Mississippi National Guard. *See* Miss. Const. art. 9, § 216 & § 218. Even though the Governor's recommendation for Brigadier General must be confirmed by the Senate, it still nevertheless an "executive appointment." Even our Chief Justice has recognized that Justice Waller's appointment was from Governor Musgrove. On February 1, 2000, Chief Justice Pittman sent a mass e-mail to Supreme Court employees in which he recognized Justice Waller's appointment.[16] Second, as a Brigadier General, Justice Waller is under the orders of the Governor. Members of the National Guard are subject to the orders of the Governor. *See* Miss. Const. art. 5, § 119 & art. 9, § 217. Third, even if Justice Waller's paycheck comes from the federal government, he is still in violation of separation of powers since he is not only an employee of the State but also the federal government. The Mississippi Constitution provides that "[n]o person holding or exercising the rights or powers of any office or honor or profit, either in his own right or as a deputy, or while otherwise acting for or in the name or by the authority of another, under any foreign government, or under the government of the

---

[16] See attached email.

32

United States, shall hold or exercise in any way the rights and powers of any office of honor or profit under the laws or authority of this state, except notaries, commissioners of deeds, and United States commissioners." Miss. Const. art. 14, § 266.

¶68. There is no valid argument which can justify the dual positions of Justice Waller. If he is an employee of the State, then he is serving in two branches of State government which is prohibited by the Mississippi Constitution, specifically Art. 1, § 1 & 2. In fact, Article 1, § 2 of the Mississippi Constitution provides that a person serving in one branch of government who accepts an appointment in another branch of government must "vacate any and all offices held by the person so accepting in either of the other departments." Likewise, if Justice Waller is claiming to hold an office at the state level and the federal level, he is still in violation of the Mississippi Constitution. As quoted above, Article 13, § 266 of the Mississippi Constitution forbids the simultaneous holding of offices at the state and federal level.

¶69. This Court is fraught with underhanded and manipulative processes. The "majority caucus" rules the roost with little concern as to the appearance of impropriety and the mandates of the Code of Judicial Conduct.

¶70. As to the merits of the motion for rehearing, the majority disregards the supreme law of this State and holds that Miss. Const. Art. 6, § 165 is not applicable. In fact, the majority even states that the Governor is not "constitutionally authorized" to appoint special justices unless there is an absence of a quorum of this Court on a case. The majority rests its assertions upon the theory that all that is needed for a majority vote to reverse the trial court

33

is a "vote of five" as alluded to in *Slush*, 201 Miss. 113, 29 So.2d 311. The majority's reading of *Slush* is misleading.

¶71.    In 1916, the Constitution was amended to change the composition of this Court from three to six Justices. Miss. Const. art. 6, § 145A. Section 145A specifically provided, in relevant part that:

> The Supreme Court shall consist of six judges, that is to say, of three judges in addition to the three provided for by section 145 of this Constitution, **any four of whom when convened shall form a quorum.**

Miss. Const. art. 6, § 145A (emphasis added). Under this constitutional mandate, four out of six Justices were required for a "quorum." As early as 1917, this Court was given an opportunity to pass upon the application of Section 145A.  In *Brewer v. Browning*, 115 Miss. 358, 76 So. 267 (1917) (*Brewer I*), this Court was called upon to determine the legal status of an alleged adopted child as it pertained to her inheritance rights. *Id.* at 268-69. In ultimately deciding the issues presented, only three members of the six member Court formed the majority. *Id.* at 267-68. One member of the Court did not participate, and two other members of the Court dissented. *Id.* at 273-79. It was upon these facts, that *Brewer v. Browning*, 115 Miss. 358, 76 So. 519 (1917) (*Brewer II*), came before this Court. In *Brewer II*, this Court failed to recognize the true mandates of Section 145A and instead found that there was "no limitation in the Constitution on the power of the court to overrule decisions, or change its decision when in the opinion of the court a former decision may be erroneous or wrongful." *Id.* at 519.

34

¶72.    Then in 1935, this Court again was given a chance to pass upon the application of Section 145A in *Dean,*162 So. 155.   In *Dean*, this Court stated that:

> Counsel for the appellant, in another suggestion of error, says that where the judges of this court are equally divided on the question of error vel non in the rulings of the trial court, the judgment of that court should be reversed; **but all of us agree that this can only be done with the concurrence of a majority of the judges.** . . . .

*Id.* at 156 (emphasis added).   Under this holding, at least four out of six Justices were required to concur upon an issue in order to form a majority.   Under this interpretation,  a nine Justice Court must have two thirds of its Justices concur in order to constitute a majority.   As such, six out of nine Justices are required to concur for the formation of a majority.   Regardless of the number of Justices which are participating on the case.   It is of no consequence that only seven or even six Justices are participating.   Six Justices concurring is still required.

¶73.    Likewise, it was under Section 145A that this Court in 1947 in *Slush*, 201 Miss. 113, 28 So.2d 738, held the following:

> During the period within which this case was submitted, considered and decided one of the six members of the Court was absent because of illness.   The decree of the trial court was reversed by the concurrence of three judges, two dissenting.  Appellee raises the point, and presents it in an interesting manner, that a decree or judgment is not lawfully reversed except by the concurrence of a majority of the entire Court–that three judges in banc are not empowered to order a reversal.
> The amendment to the Constitution of 1890 made in 1916, Sec. 145A, which increased the membership of the Supreme Court to six Judges contained the provision that, "any four of whom when empowered shall form a quorum."  The commonly recognized definition of a quorum is that it is such a number of a body as is competent to transact business in the absence of the other members.  35 Words and Phrases, Perm.Ed., p. 672 et seq.

35

Acting upon this express authority, our Supreme Court during the entire course of the thirty years since the amendment has always proceeded with the business of the Court when as many as four members are present and participating, and in the same manner as if those present comprised the entire membership of the court, and because during the thirty years there has never been a time when less than four members were present and participating, we have never within that period made a request upon the Governor to appoint a special judge for the Court. . . .

In the year immediately next following the adoption of the amendment, the case of **Brewer v. Browning**, 115 Miss. 358, 76 So. 267, L.R.A.1918F, 1185 Ann.Cas.1918B, 1013 was decided with five judges participating, one judge disqualified. The decree of the Chancery Court was reversed by the vote of three Judges, two voting for an affirmation. A case by case search through the eighty volumes of our official reports since that time will disclose that not less than a dozen cases have been disposed of under the same procedure, consistently followed for more than a quarter of a century.
**It is too late now to consider that all those cases were decided without constitutional authority, because reversed by the vote of three instead of four Judges. . . .**

201 Miss. 116, 28 So.2d at 311-12 (emphasis added). As one can clearly see, this Court did not hold; as the majority so finds; that the vote of three Justices constituted a majority. Rather, what this Court did hold is that the vote of three was "**without constitutional authority**;" however it was too late to reverse for such cause. *Id.*

¶74. Then in 1950, the Constitution was amended to once again change the composition of this Court to nine Justices. Miss. Const. Art. 6, § 145B. Section 145B, in relevant part, provides that:

The Supreme Court shall consist of nine judges, that is to say, of three judges in addition to the six provided for by section 145A of this Constitution, **any five of whom when convened shall constitute a quorum.**

36

Miss. Const. art. 6, § 145B (emphasis added). Under the amendment, five out of nine Justices are required for a "quorum." Miss. Const. art. 6, § 145B. Looking not only to the case law, but also to the constitutional provisions themselves, one can clearly see that with only five participating it is a plurality vote and nothing more.

¶75. The implication and application of Section 165 of the Mississippi Constitution is the most important issue before this Court for consideration. Section 165 provides, in relevant part, that:

> Whenever any **judge of the Supreme Court** or the judge or chancellor of any district in this state shall, **for any reason**, be unable or disqualified to preside at any term of court, <u>**or in any cause**</u> **where the attorneys engaged therein shall not agree upon a member of the bar to preside in his place, the governor may commission another, or others, of law knowledge, to preside at such term or during such disability or disqualification in the place of the judge or judges so disqualified.**

Miss. Const. art. 6, § 165. As an integral part of our original Constitution, Section 165 was and still is supreme law. Only the people of this State have the power to alter, amend, and/or abolish any portion of the Constitution. Miss. Const. art. 15, § 273. As the supreme law of this State, any suggestion by the majority of this Court that judicial precedent is contrary and superior to this constitutional section is a denial of the due process and equal protection rights as she has been vested with and afforded the protections and application of Section 165 as a citizen of this State. Miss. Const. art. 3, §§ 14 & 32. By not giving Langston and the other litigants notice of the recusal and/or non-participation of two Justices, the majority denied Langston the right to assert and seek special appointment under Section 165. The majority attempts to trivialize the notice requirement and dismiss the need for notice by

37

asserting that if notice was required under these circumstances, judicial delay would be created since three to five hundred cases a year require Justice recusal or non-participation. My response to this claim is that **due process is not a matter of judicial economy, but a matter of right**. They delayed this case for over four years already. Their argument is disingenuous. Under Section 165, Langston has not only a **right** to petition the Governor for the appointment of a "special justice," when a Justice of this Court has recused himself but attempt to get the other litigants to agree on substitutions. This right cannot be taken away without due process of law. Additionally, under *Hoskins v. Howard*, 214 Miss. 481, 502, 59 So.2d 263, 271-73 (1952), the appointment of a special judge pursuant to Section 165 is necessary if the appointment of such judge could affect the outcome of the proceedings.

¶76. It is also worth noting, that currently before this Court on Motion for Rehearing is the case of *Wise v. Valley Bank*, -- So.2d -- , 2003 WL 21101211 (Miss. 2003). The Petitioners in *Wise* also attempt to invoke Section 165 and claim that they were prejudiced by the recusal and/or non-participation of a Justice. They argue that the outcome of the case could have been different if nine Justices would have decided their case. One has to wonder, why the rush to an "emergency" en banc in the present case, and not in the *Wise* case? I am of the opinion that more litigants have been aggrieved by the manipulative affect of recusal and/or non-participation of Justices so that the outcome is changed. Maybe if the legal community opens its eyes to see the underhanded practices of the "majority caucus," then eventually someone will convince this Court to change their beliefs or convince someone else that a system of checks and balances is needed to ensure that Justice is indeed "blind."

Interestingly enough, the "majority caucus" does not complain about the Governor's appointment of Justice Carlson to the bench in 2002. Even the facts surrounding this appointment seem more than a little sketchy. Justice Carlson and his wife own the controlling shares of the Bank of Batesville. As a member of the banking industry, Justice Carlson and Aubrey B. Patterson, Jr., the BankcorpSouth President, are "acquaintances" to say the least. It is not a coincidence that Justice Carlson was appointed by the Governor, since Aubrey Patterson, attorney Richard F. Scruggs, and Governor Ronnie Musgrove are friends. It is also suspicious and causes concerns that Justice Carlson has not recused himself from this case despite the fact that Scruggs is an attorney in this case. Perhaps there was a higher calling since Langston is considered a trial lawyer and Patterson is diverse to them.

¶77. As to the merits of Langston's claims regarding the application of the crime/fraud exception to the confidential in camera documents, I stand by my original dissent. Since my original dissent correctly analyzes the facts and law, I will not change one word and will only restate its contents as an illustration of how convinced I am that the crime/fraud exception applies.

¶78. This interlocutory appeal has been before this Court for over four years concerning a pre-trial discovery matter. One can only wonder if the delay has been intentional. In the present proceeding, the case has flipped twice. Justice Cobb won back the majority recently after a Justice recused himself. It is of the utmost importance that Article 6, Section 165 of the Mississippi Constitution be utilized here where so few Justices are participating in the case. Under that provision, the Governor is given power to appoint a Special Justice "to

39

preside at such term or during such disability or disqualification in the place of the judge or judges so disqualified." Miss. Const. art. 6, § 165.

¶79. The majority erroneously finds that the thirty documents, which the trial judge reviewed in camera and ordered production, are protected by the attorney client and work product privileges. The majority's findings are repugnant to the spirit of the privileges and go against the very purpose of privilege protection. The trial court's order of production should be affirmed. For this reason, I dissent.

*FACTS*

¶80. The majority fails to include many facts which are pertinent to this case. For this reason, I will give a short rendition of those facts which were so cleverly deleted from its opinion. This case involves the husband of an attorney for a litigant who allegedly accessed her phone records and gave out the information to the attorney for the other side of the suit. The defendants to this suit now assert the attorney client privilege, the work product privilege, and the common interest privilege.

¶81. In 1994, during the tobacco litigation, Cynthia Langston (Langston) was involved in a heated divorce proceeding with Mike Miller (Miller). Miller worked in management for Bell South Telecommunications (Bell South) in Jackson, Mississippi. In the past, George Hewes's (Hewes) daughter had worked under Miller at Bell South.

¶82. After the anonymous "haunted friend" letter came to light, Langston discovered that Hewes and Miller had met on several occasions to discuss what both describe as possible ex parte meetings between Langston and the Honorable Billy Joe Landrum (Judge Landrum),

40

the trial judge in the tobacco lawsuit.[17]  Evidence on the record reveals a sequence of events, communications, and conversations concerning Miller and Hewes's contacts with one another.

¶83.    In 1996, while Miller and Langston were going through a divorce, Miller contacted Hewes to discuss information "he might be interested in."  When Hewes, Miller, and Charles Adams, met for the first time they all claim to have had a thirty (30) to forty-five (45) minute conversation in complete "hypotheticals."  On the record, Hewes and Miller denied having any further contact with one another in 1996, besides a happenstance meeting in downtown Jackson.

¶84.    Hewes admitted to contacting Miller in 1997 and having lunch with him to follow up on their previous discussion.  At this time, Miller told Hewes about his divorce settlement and how he was not supposed to interfere with Langston's personal or business life.  Thereafter, Hewes volunteered to review the settlement agreement.  After this, the two claim to have had no further contact.

¶85.    The thirty documents at issue reveal a quite different scenario than that claimed by Hewes and Miller.  The in camera documents reveal at least seventy-six and one tenth (76.1) hours billed to Brown and Williamson Tobacco Co. (B&W) concerning contacts, discussions, and information gathered from Miller.  Numerous telephone conversations are contained in the documents and other notations which may also involve information

---

[17] Just one year after the alleged communications between Miller and Hewes began, Hewes and Brown & Williamson Tobacco Co. successfully pursued Judge Landrum's disqualification in the tobacco litigation.

41

exchanged between the two. In 1996 alone, when allegedly only one meeting took place, nine notations appear in Hewes's billing statements to B&W concerning contacts with Miller and discussions concerning information related to Miller. This is five more entries than claimed by Hewes. Those nine entries in 1996 constituted thirty and one half (30.5) billed hours to B&W. Furthermore, in 1997, Hewes's billing statements include ten entries concerning contacts, conversations, and discussions with Miller totaling thirty and one half (30.5) billed hours to B&W. A total of thirty-five (35) entries constitute seventy-six and one tenth (76.1) billed hours to B&W.

¶86. During this two year period when the alleged contacts between Miller and Hewes took place, Miller admits to accessing the phone records of Langston. He even admits that after he was terminated by Bell South, the accessing of Langston's telephone records "greatly diminished."

*DISCUSSION*

*I. DID THE CIRCUIT COURT ERR BY CONDUCTING AN IN CAMERA REVIEW OF THE DOCUMENTS IN QUESTION?*

¶87. Even though the majority addresses the issue of whether the circuit court erred by conducting an in camera review of the documents in question, it fails to state the accurate standard to be applied by the trial court in making its decision with regard to whether in camera review is appropriate. Hewes and B&W assert that *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L. Ed. 2d 469 (1989) requires that "the party seeking discovery must make a prima facie showing of a crime or fraud before the trial court can ever review

the privileged documents in camera."[18]  The majority agrees and finds that under *Zolin* in camera review is appropriate "[o]nce a party seeking disclosure of allegedly privileged materials sets forth a prima facie case that the crime-fraud exception applies . . . ."  This statement is entirely incorrect as *Zolin* only requires that a reasonable good faith belief be shown that the crime fraud exception applies in order to invoke in camera review.

¶88.   In *Zolin*, the United States Supreme Court addressed "whether in camera review at the behest of the party asserting the crime-fraud exception is *always* permissible, or, in contrast, whether the party seeking in camera review must make some threshold showing that such review is appropriate."  491 U.S. at 570, 109 S.Ct. at 2630.  The Supreme Court held that:

> In fashioning a standard for determining when in camera review is appropriate, we begin with the observation that "in camera inspection . . . is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure."  Fried, Too High a Price for Truth: The Exception to the Attorney-Client Privilege for Contemplated Crimes and Frauds, 64 N.C.L.Rev. 443, 467 (1986).  We therefore conclude that **a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege**.  *Ibid.*  The threshold we set, in other words, need not be a stringent one.
>
> We think that the following standard strikes the correct balance.  **Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,"** *Caldwell v. District Court*, 644 P.2d 26, 33 (Colo. 1982), that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.
>
> **Once that showing is made, the decision whether to engage in in camera review rests in the sound discretion of the district court**.  The court should make the decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the

---

[18]  This quote comes specifically from Brief of Appellant George P. Hewes, III.

district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. . . .

The question remains as to what kind of evidence a district court may consider in determining whether it has the discretion to undertake an in camera review of an allegedly privileged communication at the behest of the party opposing the privilege

. . . .

The answer to that question in the first instance must be found in Rule 104(a), which establishes that materials that have been determined to be privileged may not be considered in making the preliminary determination of the existence of a privilege

. . . .

In sum, we conclude that a rigid independent evidence requirement does not comport with "reason and experience," Fed. Rule Evid. 501, and we decline to adopt it as part of the developing federal law of evidentiary privileges. **We hold that *in camera* review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception. We further hold, however, that before a district court may engage in *in camera* review at the request of the party opposing the privilege, the party must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability. Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged**.

491 U.S. at 572-75, 109 S. Ct. at 2630-32 (emphasis added). Nowhere in the ***Zolin*** opinion did the United States Supreme Court state that a prima facie showing of the crime fraud exception was required before a judge could review documents in camera. In fact the Court held that the lesser stringent requirement of "evidence sufficient to support a reasonable belief that the in camera review may yield evidence that establishes the exception's applicability." *Id.* at 575, 109 S. Ct. at 2332.

¶89.    Reviewing the facts presented on the record, the circuit court did not abuse its discretion in conducing in camera review of the documents in question.  There was ample

44

evidence to support a finding that there was a reasonable belief that in camera review would result in evidence that supported the crime fraud exception. Just a few facts supporting in camera review include: (1) Meetings and conferences between Miller and Hewes which were paid for by B&W; (2) Discussions between Miller, Hewes, and Adams concerning alleged improper ex parte contacts; (3) Hewes's Deposition Exhibit evidencing DayTimer Extracts which show appointments with Miller on four (4) separate occasions; (4) Miller and Langston's bitter divorce proceedings; (5) Miller's employment at Bell South; (6) Miller's admission that he has accessed Langston's telephone records in the past and has used Bell South employees to do it; (7) Testimony of the Bell South Director of Security and a Bell South Investigator concerning the accessing of Langston's phone records; (8) Inconsistent affidavits provided by Miller; and (9) A very vague description provided by Miller and Hewes concerning their "hypothetical" first meeting that lasted thirty (30) to forty-five (45) minutes. After reviewing all of these facts, the circuit court judge certainly had a reasonable belief that in camera review would result in evidence that would support the crime fraud exception.

¶90. Although the majority also finds the circuit court judge had ample proof on which to order an in camera review of the documents, it fails to correctly cite the applicable standard of review which must be fulfilled before in camera review is appropriate. Under *Zolin*, the party seeking disclosure is not required to make a prima facie case of the crime-fraud exception in order to invoke in camera review, but only to reveal a "factual basis adequate to support a good faith belief by a reasonable person." *Id.* at 572 (quoting *Caldwell v. District Court*, 644 P.2d 26, 33 (Colo. 1982)).

*II.    DID THE CIRCUIT COURT ERR IN GRANTING IN PART AND DENYING IN PART LANGSTON'S MOTION TO COMPEL CERTAIN DOCUMENTS WHICH DEFENDANTS HEWES AND B&W CLAIM ARE PROTECTED BY ATTORNEY-CLIENT PRIVILEGE, WORK PRODUCT DOCTRINE, AND COMMON INTEREST PRIVILEGE?*

¶91.    To effectively and fully review the issues presented, I must first state the law applicable to each privilege claim, then give an assessment of the circuit court's ruling and my own in camera findings concerning the thirty (30) documents in question.

¶92.    To set the stage, it must be remembered that the burden rests on the party resisting discovery to show that the material sought is privileged and/or that an attorney-client relationship exists. ***Haynes v. Anderson***, 597 So.2d 615, 618 (Miss. 1992) (citing ***Henderson v. Zurn Indus., Inc.***, 131 F.R.D. 560, 570 (S.D. Ind. 1990). *See also **United States v. Neal***, 27 F.3d 1045, 1048 n.24 (5th Cir. 1994)(citing ***United States v. Harrelson***, 754 F.2d 1153, 1167 (5th Cir. 1985)).[19]   However, when the party opposing the privilege claims an exception to the privilege applies, such as the crime fraud exception, the burden is placed on the opposing party to show that the exception is applicable. ***Clark v. United States***, 289 U.S. 1, 15 , 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); ***Neal***, 27 F.3d at 1049; ***Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.***, 953 F.2d 1004,

---

[19]    *See also **In re Santa Fe Intern'l Corp.***, 272 F.3d 705, 710 n.7 (5th Cir. 2001); ***United States v. Rodriguez***, 948 F.2d 914, 916 (5th Cir. 1991)***; Hodges, Grant & Kaufmann v. United States Gov't***, 768 F.2d 719, 721 (5th Cir. 1985); ***In re Sealed Case***, 737 F.2d 94, 99 (D.C. Cir. 1984); ***In re Boileau***, 736 F.2d 503, 506 n.1 (9th Cir. 1984); ***In re Grand July Investigation No. 83-2-35***, 723 F.2d 447, 450 (6th Cir. 1983); ***United States v. Lawless***, 709 F.2d 485, 487 (7th Cir. 1983); ***In re Grand Jury Subpoena Decus Tecum (Dorokee Co.)***, 697 F.2d 277, 280 (10th Cir. 1983); ***United States v. Jones***, 696 F.2d 1069, 1072 (4th Cir. 1982); ***United States v. Flores***, 628 F.2d 521, 526 (9th Cir. 1980).

1008 (5th Cir. 1992); *In re Intern'l Sys. & Controls Corp. Secs. Litig*., 693 F.2d 1235, 1242 (5th Cir. 1982).

## A. ATTORNEY-CLIENT PRIVILEGE

¶93. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 388, 101 S.Ct. 677, 682, 66 L.Ed. 2d 584 (1980) (citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961)). It is the purpose of the attorney-client privilege "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observation of law and administration of justice." *United States v. Zolin*, 491 U.S. at 562, 109 S.Ct. at 2625-26. See *Upjohn*, 449 U.S. at 388, 101 S.Ct. at 682. As stated in *Neal*, where the privilege exists, it

> protects communication from the client to the attorney made in confidence for the purpose of obtaining legal advice. It shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney.

27 F.3d at 1048 (quoting *Wells v. Rushing*, 755 F.2d 376, 379 n.2 (5th Cir. 1985) (citations omitted)). However, the Fifth Circuit has recognized that the privilege should not be broadened more than necessary. In *United States v. Pipkins*, 528 F.2d 559, 562-63 (5th Cir. 1976), the Fifth Circuit stated that:

> The attorney-client privilege, however, is not a broad rule of law which interposes a blanket ban on the testimony of an attorney. To the contrary,
> . . . the privilege stands in degrogation of the public's 'right to every man's evidence," 8 Wigmore (McNaughton rev. ed. 1961) s 2192 at 70, and as 'an obstacle to the investigation of the truth,' *Id.*, s 2291 at 554; thus, as Wigmore has said, 'It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'

*In re Horowitz*, 482 F.2d 72, 81 (2nd Cir. 1973), cert denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). See also *United States v. Goldarb*, 328 F.2d 280, 282 (6th Cir. 1964), cert. denied, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *Hogan v. Zletz*, 43 F.R.D. 308 (N.D.Okl. 1967); aff'd sub nom., *Natta v. Hogan*, 392 F.2d 686 (10th Cir.). The privilege does not embrace everything that arises out of the existence of an attorney-client relationship. *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968), cert. denied, 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1969); *United States v. Goldfarb*, supra; *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 40 (D.Md. 1974).

¶94. Rule 502 of the Mississippi Rules of Evidence provides for a Lawyer-Client Privilege.

Rule 502 states in pertinent part that:

> **(a) Definitions.**  As used in this rule:
> > (1) A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services for him.
> > (5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or others reasonably necessary for the transmission of the communication.
>
> **(b) General Rule of Privilege**.  A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. . . .
>
> **(c) Who May Claim the Privilege.**  The privilege **may be claimed by the client**, his guardian or conservator, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association or other organization, whether or not in existence.  **The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client**.

Miss. R. Evid. 502 (a)(1)&(5),(b) & (c) (emphasis added).  This Court has held that "the privilege is only a one-way street, for it belongs to the client only . . . [and] . . . [o]nly the

client may invoke the privilege." ***Barnes v. State***, 460 So.2d 126, 131 (Miss. 1984) (citing

***Bennett v. State***, 293 So.2d 1, 5 (Miss. 1974); ***James v. State***, 65 Miss. 179, 183, 3 So. 379,

380 (1887); Caraway & Currie, *Privileges*, 48 Miss. L.J. 989, 1028-31 (1977)). (See ***In re:***

***Grand Jury Subpoena***, 220 F.3d 406, 408 (5th Cir. 2000).[20]  The scope of the privilege has

been described by this Court as "relat[ing] to and cover[ing] all information regarding the

client received by the attorney in his professional capacity and in the course of his

representation of the client."  ***Barnes***, 460 So.2d at 131. See ***Dunn v. State Farm Fire &***

***Cas. Co.***, 927 F.2d 869, 875 (5th Cir. 1991).

¶95.    The attorney-client privilege is not without its limits and several exceptions make

information otherwise protected discoverable.  One such exception will be discussed below.

### B.  THE WORK PRODUCT DOCTRINE

¶96.    There is a distinct difference between the attorney-client privilege and the work

product doctrine.  The Fifth Circuit described this difference as:

> The attorney-client privilege exists to protect confidential communications and
> to protect the attorney-client relationship and is waived by disclosure of
> confidential communications to third parties.  The work product privilege,
> however, does not exist to protect a confidential relationship but to promote
> the adversary system by safeguarding the fruits of an attorney's trial
> preparations from the discovery attempts of an opponent.

***Shields v. Sturm, Ruger & Co.***, 864 F.2d 379, 382 (5th Cir. 1989) (citing ***United States v.***

***American Tel. & Tel. Co.***, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).  "The purpose of the

work product privilege is to further 'the interests of clients and the cause of justice' by

---

[20]  See also Official Comment to Rule 502 which states that "[t]he lawyer's claim is limited to one on behalf of the client; he himself has no independent claim."  (citing ***United States v. Jones***, 517 F.2d 666 (5th Cir. 1975)).

shielding the lawyers mental processes from his adversary." ***In re Grand Jury Subpoena***, 220 F.3d at 408 (quoting ***Hickman v. Taylor***, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). "Work product only protects documents produced by or for an attorney preparing for litigation." ***Dunn***, 927 F.2d at 875. It has further been stated that:

> The fact that litigation may still be a contingency at the time the document is prepared has not been held to render the privilege inapplicable, if the prospect of litigation is identifiable because of specific claims that have already arisen . . . The test to be applies is whether, in light of the nature of the documents and the factual situation in this particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

***Haynes***, 597 So.2d at 618 (quoting ***Hercules, Inc. v. Exxon Corp.***, 434 F. Supp. 136, 151 (D. Del. 1977)). In making the determination whether the documents in question were in fact prepared in anticipation of litigation, "courts should consider 'the nature of the documents, the nature of the litigation, the relationship between the parties, and any other fact peculiar to the case.' " ***Id.*** at 619 (quoting ***Pete Rinaldi's Fast Foods v. Great Am. Ins. Cos.***, 123 F.R.D. 198, 202 (M.D.N.C. 1988); ***Carver v. Allstate Ins. Co.***, 94 F.R.D. 131, 134 (S.D. Ga. 1982)).

¶97. Rule 26 of the Mississippi Rules of Civil Procedure controls the discovery of work product materials. Rule 26 states in pertinent part:

> **(b) Scope of Discovery.** Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
> > (3) *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that **the party seeking discovery has substantial need of the materials in the preparation**

**of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means**. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representatives of a party concerning the litigation.

Miss. R. Civ. P. 26(b) (emphasis added). Rule 26 creates an exception to non-discovery of such materials by creating a substantial need and undue hardship standard for compelling production of documents. The "burden of showing that the materials that constitute work product should . . . be disclosed is on the party who seeks their production." *Hodges, Grant & Kaufmann*, 768 F.2d at 721 (citing *Hickman*, 329 U.S. at 51-12, 67 S.Ct. at 394, 91 L.Ed. at 462-63; *In re Anthracite Coal Antitrust Litig.*, 81 F.R.D. 516, 522 (M.D. Pa. 1979); 8 J. Wigmore, Evidence § 2023 at 196) (McNaughton rev. 1961)). However, Rule 26 also places responsibility on the trial court when making such determinations to "protect against disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney or other representatives of a party concerning the litigation." Miss. R. Civ. P. 26(b).

¶98. The Fifth Circuit in *Intern'l Sys. & Controls*, 693 F.2d 1235, addressed the substantial need and undue hardship exception to the work product doctrine. In doing so the court stated that

> Some cases have found substantial need by emphasizing the importance of the documents themselves. One common justification for discovery is the claim which relates to the opposite party's knowledge that can only be shown by the documents themselves. *Bird v. Penn Central Co.*, 61 F.R.D. 43 (E.D.Pa. 1973); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 296 F.Supp. 979, 983 (E.D. Wis. 1969)
> . . . .
> We note that ultimately, these findings are part of a balancing test. The district court should weight all the factors in deciding this issue. This balance will not be overturned absent an abuse of discretion.

693 F.2d at 1241. Substantial need has also been found under other circumstances such as (1) upon a showing that the document is necessary to impeach a witness; (2) upon a showing that the document bears directly on substantive issues raised in the complaint; and (3) upon a showing that the documents are highly relevant to, probative of, and may be outcome determinative of some of the issues in the litigation. *Fed. Election Comm'n v. Christian Coalition*, 178 F.R.D. 61, 85-86 (E.D. Va. 1998).[21]

¶99.　Also the Fifth Circuit has listed two non exhaustive factors that a court should consider in making a determination of undue hardship. *In re Intern'l Sys. & Controls*, 693 F.2d at 1240-41. These factors included (1) a witness is unable to recall the events in question, or is unavailable; and (2) unusual expense in order to gather information. *Id.* Other factors include (1) whether the substantial equivalent of information is available via deposition; (2) lapse of time between the information being recorded in the document and the litigation; and (3) possible witness hostility. *Fed. Election Comm'n*, 178 F.R.D. at 86.[22] [23]

¶100.　Additionally, a party can waive the protections of the work product doctrine by disclosure of the information it seeks to protect. However, "mere voluntary disclosure to a

---

[21] *See also **In re Grand Jury Investigation**,* 599 F.2d 1224, 1233 (3d Cir. 1979).

[22] *See also* **S. Ry. Co. v. Lanham**, 403 F.2d 119 (5th Cir. 1968); **United States v. Chatham City Corp.**, 72 F.R.D. 640, 644 (S.D. Ga. 1976).

[23] In reviewing the confidential documents in question, I have not found the need to apply the substantial need and undue hardship exception under the work product doctrine. That is not to say that the exception is not applicable, but only to say that it was not necessary in my analysis to rely upon this exception in finding that the documents should be produced.

third person is insufficient in itself to waive the work product privilege." *Shields*, 864 F.2d

at 382 (citing *American Tel. & Tel. Co.*, 642 F.2d at 1298-99); 8 Wright & Miller, Federal

Practice & Procedure § 2024, at 210 (1970) (See *In re Grand Jury Proceedings*, 43 F.3d

966, 970 (5th Cir. 1994)).[24]

¶101.  The work product doctrine is also not without its limits and exceptions as  discussed

below.

### C.  THE COMMON LEGAL INTEREST PRIVILEGE

¶102.  The Fifth Circuit has described the common legal interest privilege as:

> According to our circuit precedents, the two types of communications
> protected under the CLI (common legal interest) privilege are: (1)
> communications between co-defendants in actual litigation and their counsel;
> *see. e.g., Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d
> 250, 253 (5th Cir. 1977); and (2) communications between potential co-
> defendants and their counsel.  *See Hodges, Grant & Kaufmann v. United
> States*, 768 F.2d 719, 721 (5th Cir. 1985); *Aiken v. Texas Farm Bureau Mut.
> Ins. Co.*, 151 F.R.D. 621, 624 (E.D.Tx. 1993).

*In re Santa Fe Intern'l Corp.*, 272 F.3d at 710.   In order for the common legal interest

privilege to apply "there must be a palpable threat of litigation at the time of the

communication, rather than a mere awareness that one's questionable conduct might some

---

[24]  In  *Shields*, 864 F.2d 379 (5th Cir. 1989), the court held that compelled disclosure in another case of survey prepared by expert for manufacturer's attorney's did not waive manufacturer's work product immunity regarding that survey.

In *United States v. American Tel. & Tel.*, 642 F.2d 1285 (5th Cir. 1980), the court held that while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege.

In *In re Grand Jury Proceedings*, 43 F.3d 966 (5th Cir. 1994), the court held that work product privilege encompassed third party communications.

day result in litigation, before communications between one possible future co-defendant and another . . . could qualify for protection." *Id.* at 711.

¶103. Although not specifically mentioned in Rule 502 of the Mississippi Rules of Evidence which provides for lawyer-client privilege it is encompassed in the rule as indicated in the comment to the rule. The Comment to Rule 502 states in pertinent part that:

> The privilege extends to statements made in multiple party cases in which different lawyers represent clients who have common interests. Each client has a privilege as to his own statements. The FRE Advisory Committee's Notes to Deleted Rule 503 state that the rule is inapplicable in situations where there is no common interest to be promoted by a joint consultation or where the parties meet on a purely adversary basis.

Miss. R. Evid. 502 cmt. However, Rule 26 of the Mississippi Rules of Civil Procedure, which provides for the work product doctrine, does not mention in any way shape or form a common interest privilege. Likewise, the Fifth Circuit has not addressed the application of the common legal interest privilege to the work product doctrine. However, the Fifth Circuit, while addressing the application of the common interest privilege to the attorney client privilege, did state that it applies to "communications." *Santa Fe Intern'l*, 272 F.3d at 710.[25] Clearly, the implication is that the privilege is not intended to extend to the work product doctrine. Therefore, any disclosure of claimed work product material to a third party waives the protections of the work product doctrine.

---

[25] *See also* **Hodges, Grant & Kaufmann v. United States**, 768 F.2d 719, 721 (5th Cir. 1985); **Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.**, 559 F.2d 250, 253 (5th Cir. 1977); **Aiken v. Tex. Farm Bureau Mut. Ins. Co.**, 151 F.R.D. 621, 624 (E.D.Tex. 1993).

¶104. Since the common legal interest privilege is an extension of the attorney-client privilege it too is not without limitations and exceptions which will be discussed below.

### D. THE CRIME FRAUD EXCEPTION

¶105. Though the attorney-client privilege, work product privilege, and common legal interest privilege shelter communications and documents from discovery, they are subject to exceptions. The crime fraud exception is one of these such exceptions. "Where a client seeks to use an attorney to further a continuing or future crime or fraud the broader public interest in the administration of justice is being frustrated, not promoted." *United States v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983). "The privileges for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act." *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986).

¶106. Rule 502 of the Mississippi Rules of Evidence; which provides for the Lawyer-Client Privilege provides for the crime fraud exception. Rule 502 states in pertinent part that:

> **(d) Exceptions.** There is no privilege under this rule:
>
> (1) *Furtherance of Crime or Fraud.* If the services of the lawyers were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or should have known to be a crime or fraud.

Miss. R. Evid. 502(d)(1). The Comment to Rule 502 also provides that:

> Subsection (d) excludes certain instances from the privilege. Rule 502(d)(1) does not extend the privilege to advice in aid of a future crime or fraud. The provision that the client knew or reasonably should have known of the criminal or fraudulent nature of the act is designed to protect the client who is mistakenly advised that a proposed action is lawful. See McCormick, Evidence, § 75. Existing law in Mississippi on this point is unclear. . . [T]he federal appellate court in *Hyde Construction Co. v. Koehring Co.*, 455 F.2d

55

337 (5th Cir. 1972), has determined that the Mississippi courts would allow the privilege when an attorney, acting as the client's alter ego, commits a tort or fraud. It is uncertain, if this is an accurate reflection of the scarce Mississippi law on the point, but clearly under Rule 502(d)(1) the privilege in such a case would not apply.

Miss. R. Evid. 502 cmt. Although not specifically provided for in the Mississippi Rules of Evidence or Civil Procedure, it is clear that the crime fraud exception does apply to the work product doctrine and the common legal interest privilege. *See **In re Grand Jury Proceedings***, 43 F.3d at 972; ***In re Burlington Northern, Inc.***, 822 F.2d 518, 524-25 (5th Cir. 1987); ***In re Intern'l Sys. & Controls*** , 693 F.2d at 1241-42; ***In re John Doe Corp.***, 675 F.2d 482, 492 (2d Cir. 1982); ***In re Grand Jury Proceedings***, 604 F.2d 798, 803 (3d Cir. 1979)).

¶107. It is unclear which party bears the burden for establishing that the crime fraud exception applies. There seems to be much confusion about what exact standard of proof has been adopted for invoking the crime fraud exception. In 1933, the United States Supreme Court in ***Clark***, held that:

> There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. See, e.g., ***Rynell v. Sprye***, 10 Beav. 51, 54 11 Beav. 618; ***In re Postlewaite***, 35 Fh.D. 722, 724, cf. ***Regina v. Bollivant***, (1900) 2 CBD 163, (1901) A.C. 196. But this conception of the privilege is without support in later rulings. "It is obvious that it would be absurd to say that the privilege could be got rid of merely be making a charge of fraud." ***O'Rourke v. Darbishire***, (1920)A.C. 581, 604. To drive the privilege away, **there must be "something to give colour to the charges'; there must be 'prima facie evidence that it has some foundation in fact**." ***O'Rourke v. Darbishire***, loc. cit., supra; also pp. 614, 622, 631, 633 of (1920) A.C. When that evidence is supplied, the seal of secrecy is broken. See, also,

*Regina v. Cox*, (1884) 14 Q.B.D. 153, 157, 161, 175; cf. *Bujac v. Wilson*, 27 N.M. 112, 196 P. 513; *In re Niday*, 15 Idaho, 559, 98 P. 845.

289 U.S. at 15-16, 53 S.Ct. at 469-70 (emphasis added). Upon these statements, courts began requiring a prima facie showing in order to invoke the crime fraud exception.[26]    In 1989, the Supreme Court in *Zolin* was called upon to review the application of the crime fraud exception and declined to address the quantum of proof necessary to establish the exceptions applicability. 491 U.S. at 564, 109 S.Ct. at 2626. However, due to criticisms of  the standard adopted in *Clark*, the United States Supreme Court in *Zolin* included a footnote  regarding the standard. The note reads as follows:

> We note, however, that this Court's use in *Clark v. United States*, 289 U.S. 1, 14, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933), of the phrase "*prima facie* case" to describe the showing needed to defeat the privilege has caused some confusion. See Gardner, The Crime or Fraud Exception to the Attorney-Client Privilege, 47 A.B.A.J. 708, 710-711 (1961); Note, 51 Brooklyn L.Rev. 913, 918-919 (1985) ("The *prima facie* standard is commonly used by courts in civil litigation to *shift* the burden of proof from one part to the other. In the context of the fraud exception, however, the standard is used to dispel the privilege altogether *with* affording the client an opportunity to rebut the *prima facie* showing" (emphasis in original)). See also *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1039 (CA2 1984). In using the phrase in *Clark*, the Court was aware of scholarly controversy concerning the role of the judge in the decision of such preliminary questions of fact. See 289 U.S., at 14, N., 53 S.Ct., at 469, n. The quantum of proof needed to establish admissibility was then, and remains, subject to question.. See, e.g., Maguire & Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv.L.Rev. 392, 400 (criticizing courts insofar as they "have allowed themselves to be led into holding that only a superficial, one-sided showing is allowable on any admissibility controversy"), 414-424 (exploring alternative rules (1927); 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5052, p. 248 (1977) (suggesting,

---

[26]  See also *Neal*, 27 F.3d at 1048; *Indus. Clearinghouse, Inc.,* 953 F.2d at 1008; *Ward v. Succession of Freeman*, 854 F.2d 780, 790 (5th Cir. 1988); *In re Inter. Systems & Controls* , 693 F.2d at 1242.

with respect tot he process of proving preliminary questions of fact, that "perhaps it is a task, like riding a bicycle, that is easier to do if you do not think to much about what you are doing"). In light of the narrow question presented here for review, this case is not the proper occasion to visit these questions.

491 U.S. at 564 n.7, 109 S.Ct. 2627 n.7 (emphasis added). The footnote in **Zolin** seems to suggest that the prima facie standard is questionable.

¶108. The Fifth Circuit has defined prima facie as:

> [evidence] [s]uch as will suffice until contradicted and overcome by other evidence . . . [a] case which has proceeded upon sufficient proof to that stage where it will support [a] finding if evidence to the contrary is disregarded.

*In re Intern'l Sys. & Controls* 693 F.2d at 1242 (quoting Black's Law Dictionary (4th ed. 1968)). In line with this definition, courts have adopted a two-part test for a prima facie showing:

> The party challenging the privilege must (1) make an independent *prima facie* case that a crime [or fraud] has been committed, and (2) then demonstrate that the privileged information bears a relationship to the alleged crime or fraud.

*Ward,* 854 F.2d at 790 (citing *In re International Systems & Controls Corp.*, 693 F.2d at 1243)). The type of evidence which may be used to satisfy such burden not only includes the relevant non-privileged evidence which plaintiffs have gathered, but also the evidence which the defendants claim is privileged that the trial judge views in camera. See *Zolin*, 491 U.S. at 574-75, 109 S.Ct. at 2632.[27]

---

[27] In *Zolin*, the United States Supreme Court specifically held :

We hold that *in camera* review may be used to determine whether allegedly privileged attorney-client communications falls within the crime fraud exception. We further hold, however, that before a district court may engage in *in camera* review at the request of the party opposing the privilege, that

*III. DID THE CIRCUIT COURT ERR BY CONCLUDING AFTER IN CAMERA REVIEW THAT THE THIRTY (30) DOCUMENTS IN QUESTION, WHICH WERE CLAIMED BY THE PRIVILEGED, WERE DISCOVERABLE?*

¶109. I have reviewed in camera the thirty documents in question. I find that the circuit court did not err when it decided that all thirty documents presented to this Court were discoverable. Without providing in-depth discussion into their content, a short explanation as to why I find all to be discoverable will be provided.

*A. ITEM 2: FILE MEMO BY HEWES CONCERNING HIS 1996 CONTACTS WITH MILLER.*

¶110. In order to be afforded protection under the attorney-client privilege, an attorney-client relationship must exist. *See* Miss. R. Evid. 502(b). There was no attorney-client relationship between Hewes and Miller. In fact, Hewes and Miller have conceded such. Clearly, Miller was not a client and was not even a fact witness to the tobacco litigation. Also, in order to be afforded protection under the work product privilege, the materials must have been prepared in anticipation of litigation. See Miss. R. Civ. P. 26(b)(3). There was no litigation or even possible litigation involving Hewes and Miller.

---

party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability. Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged.

491 U.S. at 574-75, 109 S.Ct. at 2632.

¶111. Hewes claims the file memo were protected under his attorney-client privilege and work product privilege concerning his representation of B&W; however, the document is still discoverable because the crime fraud exception applies.

¶112. Furthermore, the common legal interest privilege is not applicable. There was no common interest in litigation as between Hewes and Miller. Also, any common interest privilege claimed between B&W and Hewes also fails.

B. *ITEM 23: VARIOUS LETTERS, MOTIONS, AND AFFIDAVITS.*

¶113. The documents under Item 23 are not confidential communications within the meaning of the attorney-client privilege. However, they are work product. But since all the documents under Item 23 have been voluntarily disclosed to third parties; including the court and Langston's counsel; any privilege to these documents has been waived.

C. *ITEM 25: A MEMORANDUM CONCERNING POSSIBLE*
*ETHICAL VIOLATIONS STEMMING FROM MEETINGS*
*BETWEEN HEWES AND MILLER.*

¶114. Since it has already been established that there is no attorney-client relationship between Hewes and Miller, it is not necessary to address privilege applicability between them concerning this item. Likewise, the common interest privilege is not applicable.

¶115. Furthermore, the privilege claim that existed between Hewes and B&W as related to Item 25 falls squarely under the crime fraud exception.

D. *ITEMS 26, 35, 36, 37, & 38: LETTER CONCERNING DRAFT*
*AFFIDAVIT OF MIKE MILLER AND DRAFT AFFIDAVIT OF*
*MIKE MILLER AS PREPARED BY HEWES.*

¶116. Again, as discussed above no attorney-client relationship exists between Hewes and Miller; therefore the privilege claim as to Items 26, 35, 36, 37, & 38 is without merit. Furthermore, the common legal interest privilege does not apply.

¶117. As this draft document was intended to be disseminated to third parties, it is not privileged. *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 485 (D. Kan. 1997) (citing *United States Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156 (E.D.N.Y. 1994)). Additionally, the privilege claim as to Items 26, 35, 36, 37, & 38 between B&W and Hewes is subject to the crime fraud exception and is therefore discoverable.

> E.   ITEMS 30 & 31: DRAFT LETTERS AND AFFIDAVIT OF HEWES CONCERNING CONTACTS BETWEEN MILLER AND HEWES.

¶118. As established, there is no attorney-client relationship between Miller and Hewes which would invoke the applicability of privilege. Also, the common interest privilege is not applicable.

¶119. Furthermore, Items 30 & 31 are not protected by the attorney-client privilege as between B&W and Hewes since the documents are not "communications" within the meaning of the privilege. *See* Miss. R. Evid. 502(b). However, the documents are work product. Nevertheless, the documents are still discoverable since the crime fraud exception applies. Alternatively, the documents are discoverable since they are drafts of letters and affidavits to be presented to plaintiff counsel. As stated above "[d]rafts of documents to be submitted to third parties, although prepared by counsel, are not generally privileged." *Id.*

> F.   ITEMS 47, 48, 49, 50, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, & 68: BILLING STATEMENTS AND DAYTIMER EXTRACTS OF HEWES CONCERNING CONTACTS AND CONVERSATIONS WITH MILLER AS BILLED TO B&W.

¶120. As discussed above, no attorney-client relationship exists between Miller and Hewes which would make the documents in Items 47-50, 52-53, & 55-68 privileged. Furthermore, no common legal interest privilege applies.

¶121. The documents in Items 47-50, 52-53, & 55-68 are not attorney work product, as they were not prepared in anticipation of litigation. The documents are however; as noted by Hewes and B&W in their briefs; confidential communications. As other courts have found, billing statements fall within the protections of the attorney-client privilege. See *Chaudhry*, 174 F.3d at 403; *Clarke,* 974 F.2d at 129. However, as has already been discussed the attorney client privilege is subject to the crime fraud exception. After reviewing these billing statements in camera, it is noted that the combined notations in Hewes's day timer and billing statements to B&W show thirty-five entries which mention conversations and information concerning Miller. Those thirty-five entries alone total seventy-six and one/tenth (76.1) hours billed to B&W concerning just conversations or information concerning Miller. Of those thirty-five (35) entries, nine (9) were made in March of 1996 about the time Miller and Hewes claim they had one conversation which was totally in "hypotheticals". Those nine (9) entries alone total thirty and one half (30.5) billed hours to B&W. In 1997, Hewes's billing statements show ten (10) entries concerning contacts and discussions with Miller which total thirty and one half (30.5) billed hours to B&W. Also, there are numerous other notations in the billing statements and daytime extracts which indicate that some fraudulent activity was afoot. Upon reviewing the in camera material and the non-privileged facts which are in the record, Langston has met her burden of proof and the crime fraud exception applies to Items 47-50, 52-53, & 55-68.

*IV.*

¶122.  In sum,  the circuit court did not abuse its discretion by reviewing the documents in question in camera.  Furthermore, the circuit court correctly applied the law and made the necessary findings of fact to hold that the documents presented in camera were discoverable. Accordingly, the circuit court's order compelling production of the thirty (30) documents should be affirmed and this case remanded for further proceedings.  Miller was not a client or fact witness in the tobacco litigation.  He was the soon to be ex-husband of an attorney who represented a plaintiff in tobacco litigation.  Because of Miller's position at Bell South he was able to access Langston's telephone records and give such information to the attorney for the other side in the tobacco litigation.  Such conduct should not be allowed to stand and be covered up from the light of day under the guise of attorney-client, work product, and common interest privileges.   The chips should be allowed to fall where they may and the documents produced as ordered by the circuit court.   For these reasons, I dissent.

¶123.  I again object to the majority's haste in proceeding upon this motion for rehearing. The majority has gone to extreme measures to expeditiously restrict the rights and powers vested in the Governor by Art. 6, § 165 and arbitrarily circumvent the rights and protections afforded Langston by the Mississippi Constitution.  No emergency en banc was ever needed on this matter.  The "emergency" treatment of this motion for rehearing is the majority's effort to cut off Langston's exercise of her constitutional rights.  For the reasons stated herein, I dissent to the majority's findings on this motion for rehearing.

63

# *APPENDIX*

**Sent:**                     *Tuesday, February 01, 2000 3:01 PM*
**To:**                      << Supreme Court >>
**Subject:**           Justice Waller

For Your Information:

Justice Waller has been selected by Adjutant General George Walker and Governor Musgrove for promotion to Commanding General of the Mississippi National Guard Troop Command. This will promote Justice Waller to Brigadier General and in effect make him the Commanding General of the 7,500 to 8,000 Mississippi National Guard troops.

This has not been announced, but is a "done deal" and Justice General Waller should be commended.

I can't believe he has time to raise a large family, do his work at this court and "run the troops. but he thinks he can handle it.

Justice General Pittman

1

## STATEMENT OF
## JUSTICE WILLIAM L. WALLER, JR.,
## IN RESPONSE TO
## PRESIDING JUSTICE McRAE'S DISSENT

¶124. Presiding Justice McRae objects to my participation in an administrative matter pending before the Court. The administrative matter arose in the context of this case, but it had nothing to do with the merits of the case at bar. It pertained to the procedural processes of the Court.

¶125. The administrative matter concerned what should occur when a Justice has chosen not to participate in a case pending before the Court. The issue was resolved in the case of *Public Employees Retirement System of Miss. v. Hawkins*, 775 So. 2d 108 (Miss. 2000) (If there is an absence of a sufficient number of Justices to rule upon a matter, the attorneys involved shall submit a list of members of the bar to serve as Special Justices to consider and determine all issues; if the attorneys cannot agree on a list, the Governor shall appoint the Special Justices). I direct the readers' attention to then Presiding Justice Banks' account of the evolution of the process of replacing justices who are not participating in a matter. Also see *Doe v. Stegall*, No. 2001-CA-01674-SCT, in which Chief Justice Pittman discusses the propriety of having the Governor appoint a replacement justice. In *Stegall*, the plaintiff, who was represented by Shane Langston, filed a similar motion to have the Governor appoint a special justice to replace Presiding Justice McRae.

¶126. The relevant inquiry in the issue of replacing non-participating justices is whether there is a quorum of justices to decide the matter. Under Miss. Constitution Article 6, § 145B, five justices constitute a quorum. So, therefore, the process of selecting special

65

justices should not begin unless there are less than five participating justices. After Cynthia Langston filed a motion for the Governor to replace Justice Diaz and me, I was asked to participate in the vote on the motion. I did so with a clear conscience. The motion was denied because of clear precedent to the contrary. In the end, the seven participating justices in the case have rendered an opinion on the merits, and the Court's decision to continue with only seven participating justices had absolutely nothing to do with the merits of the case.

¶127. I should point out that no complaints for my participation in the administrative matter have been filed against me before the Commission on Judicial Performance. I sincerely believe that if a complaint were to be filed, it would be dismissed because my participation did not affect anyone's substantial rights or the merits of the lawsuit in any way. All my vote did was to reaffirm existing precedent.

¶128. I now address Presiding Justice McRae's erroneous claims that my service as a Justice of the Mississippi Supreme Court and as a Brigadier General in the Mississippi National Guard violates the separation of powers clause of the Mississippi Constitution. The Constitution provides that "all able-bodied male citizens of the state between the ages of eighteen and forty-five years shall be liable to military duty in the militia of this state, in such manner as the legislature may provide." Miss. Const. art. 9, § 214. This provision does not exclude governmental officials from being liable for military service. As one court has stated:

> We would hesitate to impute to the framers of our Constitution an intent to deprive citizens of the emoluments and honors of a civil office on the ground they are engaged temporarily in military service in time of war. No such result was intended or reached in the framing and adoption of our Constitution. We

66

are cognizant that the Constitution of the State is operative in war as in peace, and we would not subtract an iota from the principle of our organic law. *Moreover, no provision of the Constitution should be so absurdly construed as to penalize a citizen on account of his efforts to maintain it.*

*State ex rel. Thomas v. Wysong*, 24 S.E.2d 463, 468 (W. Va. 1943) (emphasis added).

¶129. Presiding Justice McRae contends that the Guard is an agency of the executive branch because the Governor is Commander-in-Chief, and that, because Guard officers function under the executive branch and judicial officers under the judicial branch, my dual service violates the separation of powers clause. However, our Constitution grants the Governor military power in Art. 9, § 217, and grants the Governor civil power, or "chief executive power," in Art. 5, § 116. Certainly the framers of the Constitution intended that the military power should be separate from the executive power. Furthermore, Art. 9, §§ 215 and 216 provide that the *Legislature* has the power to organize, arm, equip and discipline the militia, and that the *Legislature* must consent to the Governor's appointment or suggestion of removal of a commissioned officer. If the Guard is under the executive branch, as Presiding Justice McRae suggests, why would the Constitution allow legislative interference? The obvious and correct interpretation of the Constitution is that serving in the Guard does not prohibit that person from serving his state in a branch other than the executive branch. Requiring governmental officials to choose between their public offices or the Guard would be unjust and inconsistent with the spirit of public duty.

¶130. The contention that the State Constitution is in conflict with the U.S. Constitution is without merit. Admittedly, the Mississippi National Guard has a uniquely dualistic role as shown by its name which includes "Mississippi" and "National." It has its constitutional

67

roots in the right of states to raise and maintain a militia, but Congress also has authority to raise and support armies. Congress may regulate states' militias through the Militia Clause of the U. S. Constitution. *See* U. S. Const. art. I, § 8. Furthermore, the Militia Clause "recognizes the supremacy of federal power in the area of military affairs." ***Perpich v. Department of Defense***, 496 U.S. 334, 351, 110 S. Ct. 2418, 110 L. Ed. 2d 312 (1990) (footnote omitted). Thus, Presiding Justice McRae's suggestion that my service with the Guard violates Miss. Const. art. 14, § 267 is moot because federal law trumps state law in this area.

¶131. This principle is illustrated by federal legislation which prevents employers from firing persons who have lengthy absences due to their service in the military. *See* 38 U.S.C. § 4301 (2003). The stated intent of this legislation is to "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civil careers" and to "prohibit discrimination against persons because of their service to the uniformed services." 38 U.S.C. § 4301(a). This legislation applies to the states. Therefore, even if Miss. Const. art. 14, § 267 were interpreted to mean that I cannot serve in the Guard and hold state office, it must give way to the supremacy of the federal law which regulates state militias.

¶132. Miss. Code Ann. § 33-1-1(b) (Rev. 2000) makes a distinction between the "Mississippi State Guard," and the "Mississippi National Guard." Indeed Chapter 5 of Title 33 pertains to "The Militia and Mississippi State Guard," and Chapter 7 of Title 33 refers to the "National Guard."

¶133. Miss. Code Ann. § 33-7-1(a) (Rev. 2000) provides:

> The Mississippi National Guard shall consist of the organized militia within the ages *prescribed by federal law and regulations*, . . and of commissioned officers and warrant officers within the ages and having the qualifications *prescribed by federal law and regulations*. The number of officers and enlisted men of the national guard and the grades and designations thereof shall be as now or hereafter *prescribed by federal law and regulations relating to the national guard, and all commissions and promotions shall be in accordance with the aforesaid regulations.*

(Emphasis added.)

¶134. Finally, Miss. Code Ann. § 33-1-9 (Rev. 2000) provides as follows:

> Any citizen of this state may accept and hold a commission or warrant in the militia of this state or hold enlisted membership in the militia of this state or a commission in any reserve component of the armed forces of the United States without vacating any civil office, position or commission held by him, and the acceptance of holding of any such commission, warrant or membership and receiving pay therefrom *shall not constitute such holding of an office privilege and trust under the government of this state or of the United States as shall be incompatible with the holding of any civil office, legislative or judicial, or position or commission under the government of this state and receiving the emoluments therefor.*

(Emphasis added.) Thus, under the provisions of our own statutes, there is no merit to Presiding Justice McRae's allegations that I serve under the executive branch of the State of Mississippi or that my work as a Justice of the Supreme Court and as a Guard officer violates the separation of powers doctrine.

¶135. Presiding Justice McRae has made several other accusations. He states that the "majority caucus" had "made a determination as to the outcome [of the motion for appointment of special counsel] without an en banc or vote ever having been conducted." Regardless of when Central Legal prepared the proposed order, the *vote* on the motion did

not take place until the en banc was assembled. Lawyers customarily draw up proposed orders prior to a judge's ruling on a motion. This is done for efficiency's sake, not for improper motives. Furthermore, if the Court was to follow precedent in ruling upon the motion, I admit, yes, the determination of the outcome of the motion was made prior to the en banc. The Court, as a rule, follows precedent. There was no reason for the Court to believe that Cynthia Langston's motion constituted an exception to this rule.

¶136. There is absolutely nothing improper for two or more justices to have strategy sessions. Some justices meet with others to talk about the issues and to determine what the best approach to resolving the issues might be. The issues may be administrative. We may meet prior to an oral argument. Again, we have strategy sessions for efficiency's sake.

¶137. Presiding Justice McRae cites *Banana v. State*, 638 So. 2d 1329, 1331 (Miss. 1994), for the proposition that a recused judge may not participate in the appointment of a replacement judge. This case is not relevant to this matter because I in no way participated in the appointment of a replacement judge. I merely voted on what process to use in deciding whether a replacement judge was needed.

¶138. His statement that a conflict of interest arose because Governor Musgrove, who appointed me as Brigadier General of the Mississippi National Guard, would be the same person who would appoint a replacement judge does not follow a logical progression. I voted to follow the Court's administrative processes, not to influence Governor Musgrove in any way about whom to appoint as a replacement judge, if he were called upon to do so. Cynthia Langston, not I, wished to have Governor Musgrove appoint a replacement justice. I voted against having Governor Musgrove possibly make such an appointment. How could

70

a conflict of interest arise under these circumstances? Presiding Justice McRae's innuendo is preposterous.

¶139. Presiding Justice McRae has grossly overstated my salary. If he had been interested in accuracy, salaries for Supreme Court Justices are set by the Legislature and are codified in a statute, and the pay scale paid to Guard officers is posted on several internet sites and should be considered public record.

¶140. Presiding Justice McRae alleges that "suddenly" I decided to participate in the case of *Dillard v. Musgrove*, 838 So. 2d 261 (Miss. 2003), after not participating in the merits of the case "after a year and a half." May I remind Presiding Justice McRae that I participated on a motions panel with him where we ruled upon motions in *Dillard*. Furthermore, I voted "not participating" on only one circulated proposed opinion. In every other instance, I participated in the case on the merits.

¶141. Any concerns that my service in the Guard interferes with my work as an appellate judge should be laid to rest. Court records show that I rarely miss the deadlines for votes, memoranda, and opinions. I work hard and am consistently among the three justices who have written the most opinions for any given time period, be it on a monthly or a yearly basis. I also chair the Rules Committee which has been very active in working to reform and modernize court procedures and systems. My record will stand up under any scrutiny.

¶142. I exhort Presiding Justice McRae to cease making attacks on his fellow Justices and on the Court as a whole. As he himself has stated, "[j]ustice delayed is justice denied." *Hawkins*, 775 So. 2d at 110 (McRae, J., dissenting). When we are forced to respond to Presiding Justice McRae's unfounded allegations, time is taken away from the work that the

71

Supreme Court is supposed to do: the dispensation of justice. I am not implying that there is no room for legitimate dissent. But dissents should be based on differing interpretations of fact or law, not personality conflicts or sour grapes.

¶143. Furthermore, the appropriate procedure to allege that a judge has committed an unethical or unlawful act is through the Commission on Judicial Performance, not through the official opinions of the Court. Opinions should not be used to attack the integrity of the Court and its members. They should be written to clarify existing precedent or, in some cases, make new precedent. Busy attorneys and litigants who rely on our decisions do not want to waste time reading about Court squabbles.

¶144. In closing, I fervently hope that the Court can once again work together with an esprit de corps and that we can respect each other's opinions without regard to personalities. Attorneys are held to professional standards, so judges should be held to an even greater standard. This standard demands dignity, decorum and integrity, not dirty tricks, backbiting and innuendo. Please, let us no longer delay the work of justice.

**PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., JOIN THIS SEPARATE WRITTEN STATEMENT.**